No. 86–5234. BROWN *v.* NORTH CAROLINA. Sup. Ct. N. C. Certiorari denied.

JUSTICE O'CONNOR, concurring.

I write briefly in support of the Court's denial of the petition for certiorari in this case, and to respond to JUSTICE BRENNAN's suggestion that the limits on the prosecutor's right to peremptorily challenge jurors found in *Batson* v. *Kentucky,* 476 U. S. 79

(1986), apply outside the context of racial discrimination forbidden by the Equal Protection Clause. *Batson* does not touch, indeed, it clearly reaffirms, *id.*, at 89, the ordinary rule that a prosecutor may exercise his peremptory strikes for any reason at all. *Batson*, in my view, depends upon this Nation's profound commitment to the ideal of racial equality, a commitment that refuses to permit the State to act on the premise that racial differences matter. It is central to *Batson* that a "person's race simply 'is unrelated to his fitness as a juror.'" *Id.*, at 87 (citation omitted).

There is no basis for declaring that a juror's attitudes towards the death penalty are similarly irrelevant to the outcome of a capital sentencing proceeding. Indeed, *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), upon which JUSTICE BRENNAN's dissent so heavily relies, itself recognizes the relevance of this attitudinal factor. Categorical exclusion of jurors with moral qualms over capital punishment is forbidden precisely because such a practice would produce "a jury uncommonly willing to condemn a man to die." *Id.*, at 521.

Moreover, JUSTICE BRENNAN's dissent ignores a fundamental distinction between peremptory challenges of jurors and challenges for cause. Challenges for cause permit the categorical and unlimited exclusion of jurors exhibiting an inability to serve fairly and impartially in the case to be tried, as noted in *Wainwright* v. *Witt*, 469 U. S. 412 (1985). In *Witherspoon*, the Court held that the Constitution does not tolerate such a categorical exclusion of jurors who merely express moral scruples about or general objections to capital punishment unless it would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright* v. *Witt*, *supra*, at 424 (citation omitted).

Peremptory challenges are limited in number. Each party, the prosecutor, and the defense counsel, must balance a host of considerations in deciding which jurors should be peremptorily excused. Permitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon*.

We ought not delude ourselves that the deep faith that race should never be relevant has completely triumphed over the painful social reality that, sometimes, it may be. That the Court will not tolerate prosecutors' racially discriminatory use of the pe-

remptory challenge, in effect, is a special rule of relevance, a statement about what this Nation stands for, rather than a statement of fact. In my view, that special rule is a product of the unique history of racial discrimination in this country; it should not be divorced from that context. Outside the uniquely sensitive area of race the ordinary rule that a prosecutor may strike a juror without giving any reason applies. Because a juror's attitudes towards the death penalty may be relevant to how the juror judges, while, as a matter of law, his race is not, this case is not like *Batson*.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments, I would vacate the decision below insofar as it left undisturbed the death sentence imposed in this case. *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976) (BRENNAN, J., dissenting). However, even if I believed that the death penalty could be imposed constitutionally under certain circumstances, I nevertheless would grant certiorari because the petitioner presents strong evidence that the State used its peremptory challenges in this case to exclude jurors that it was forbidden to excuse for cause under *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968).

In *Witherspoon*, this Court held that, in a capital case, the prosecution may not exclude for cause those jurors who indicate that they have scruples about the death penalty, but who nonetheless state that such beliefs would not prevent them from performing their duties as jurors according to law. Exclusion of such jurors, we said, denies a capital defendant the right to sentencing by an impartial jury that is representative of the community, for it "produce[s] a jury uncommonly willing to condemn a man to die." *Id.*, at 521. We underscored the importance of this right in *Adams* v. *Texas*, 448 U. S. 38 (1980), which held unconstitutional the exclusion of jurors who acknowledged that their concerns about capital punishment might affect their ability to find facts that would lead to its automatic imposition. Texas could not, we said, bar jurors who stated that they would honestly find the relevant facts if convinced of their existence beyond a reasonable doubt,

> "yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will

be or what they may deem to be a reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law." *Id.*, at 50.

The petitioner in the case before us, David J. Brown, was convicted of the first-degree murder of two women and given two death sentences. At *voir dire,* the prosecutor had sought to determine not merely if prospective jurors had any scruples about the death penalty that might impair their performance, but if they had any scruples about it at all. The prosecutor was remarkably candid about this objective in addressing the venire at the start of *voir dire:*

> "'We want to know if you do in fact believe in capital punishment, not wavering. We want to know at the outset, that is when we approve you as a juror, if we do, that you surely do believe in capital punishment in some cases, and that you can, if necessary, make a decision that would involve capital punishment.'" Pet. for Cert. 10.

As the *voir dire* reveals, the prosecutor diligently pursued his goal of seating only those jurors rigidly committed to the death penalty:

> "Q.: Mr. Caldwell, how do you feel about capital punishment? Are you for it or against it?
> "A.: I am for it.
> "Q.: I didn't understand you.
> "A.: I said I'm for it.
> "Q.: How long have [you] been in favor of capital punishment in some cases, Mr. Caldwell?
> "A.: All my life, every time I hear tale of something like that, about all my life, I guess.
> "Q.: That's what I wanted to hear, Mr. Caldwell.
>
> .        .        .        .        .
>
> "Q.: Mrs. Pope, do you know your mind to the extent of saying whether or not you believe in capital punishment?
> "A.: I do.
> "Q.: Have all of your adult life?

"A.: Yes, sir.
"Q.: And if ultimately you are called upon after a proper instruction by the Judge to carefully consider what should happen to, to determine life or death, that wouldn't bother you unduly, will it?
"A.: No, sir." *Id.*, at 7, 9–10.

In another exchange, after juror Williams stated that he believed in capital punishment, the prosecutor continued to question him to establish that he had the "'strength and fortitude'" to render a death verdict "without 'any doubt.'" *Id.*, at 10.

Those jurors who indicated the slightest uncertainty about the death penalty were excused by peremptory challenge, without inquiry into whether their convictions would render them incapable of performing their duties as jurors:

"Q.: Mrs. Beaver, having sat here for some several minutes in this courtroom today, you know what we are here for?
"A.: Yes.
"Q.: Having thoughts about capital punishment, at least I would assume here today, and no doubt having thought about it in the past, do you know your mind about that question?
"A.: I'm afraid I don't.
"Q.: Afraid you don't?
"A.: No.
"[Prosecutor:] The State will excuse Mrs. Beaver with our thanks." *Id.*, at 9.

The State concedes that it could not have excused for cause those jurors failing the prosecutor's litmus test. It maintains, however, that since it used peremptory challenges to accomplish this end, its conduct is immune from scrutiny. The State reads our recent decision in *Batson v. Kentucky,* 476 U. S. 79 (1986), as significant only in that it proscribes racially discriminatory peremptory challenges. It insists that, since the challenges were exercised in this case in a racially neutral manner, they are free from constitutional infirmity.

The implication of the State's position is that it is free to use its peremptory challenges to violate any constitutional command other than the Equal Protection Clause. The State, however, misses the wider significance of *Batson:* that the broad discretion

afforded prosecutors in the exercise of peremptory challenges may not be abused to accomplish *any* unconstitutional end. In *Batson,* we said that "counsel's effort to obtain *possibly relevant* information about prospective jurors is to be distinguished from the practice at issue here." *Id.,* at 89, n. 12 (emphasis added).

JUSTICE O'CONNOR's concurrence observes that, as an unfortunate matter of *fact,* race may be relevant in that it may actually influence a juror's decision. The concurrence correctly notes that such factual relevance is insufficient to justify the exercise of a peremptory challenge on the basis of a juror's race, because race has been deemed irrelevant as a matter of *law.* The concurrence, however, fails to recognize that precisely the same situation obtains with respect to scruples about the death penalty. Such scruples may be relevant as a matter of *fact.* Nonetheless, that is insufficient to justify the use of peremptory challenges to exclude jurors with such scruples, for *Witherspoon* and *Adams* make clear that this characteristic is irrelevant as a matter of *law.* It does not minimize the tragic history of race discrimination in this country to insist that we enforce the *Witherspoon* proscription just as faithfully as that forbidding reliance on race, for we may not pick and choose which constitutional rights we will and will not vindicate in monitoring the jury selection process.

Peremptory challenges may be used for reasons that may not comport completely with rational analysis, or that may resist coherent articulation. Such latitude has for practical reasons required a presumption that these challenges are exercised in a constitutionally responsible fashion. As *Batson* makes clear, however, that presumption is rebuttable. In this case, the Court is presented with evidence from the *voir dire* that plainly indicates that the prosecutor used his peremptory challenges to obtain the "hanging jury," *Witherspoon,* 391 U. S., at 523, that he could not obtain through challenges for cause. We therefore cannot maintain the usual presumption that these challenges were properly used.

Agents of the State enjoy considerable discretion in performing certain functions within the criminal justice system. With great discretion, however, comes great responsibility. When a court has evidence that the State has not lived up to that responsibility, its refusal to intervene converts discretion into a license for constitutional violation. For this reason, I would grant the petition for certiorari in this case.