STATE OF NORTH CAROLINA v. EUGENE DAVIS, JR.

No. 745A85

(Filed 7 December 1989)

1. **Criminal Law § 146.1 (NCI3d); Jury § 7.14 (NCI3d) — peremptory challenges—racial discrimination—failure to object at trial—consideration of issue by Supreme Court**

Consideration of the issue of racial discrimination in the prosecutor's use of peremptory challenges normally would be precluded on appeal where defendant made a pretrial motion to prohibit the State from using peremptory challenges in a discriminatory fashion but failed to object to the denial of the motion or to the State's exercise of any specific peremptory challenge of a black juror and failed to object generally at the conclusion of jury selection. However, the Supreme Court elected to consider this issue since defendant was tried prior to *Batson v. Kentucky*, 476 U.S. 79 (1986), was on trial for his life, and attempted to alert the trial court to the issue by his pretrial motion. N.C.G.S. § 15A-1446(a) (1988).

**Am Jur 2d, Appeal and Error § 628.**

2. **Jury § 7.14 (NCI3d) — peremptory challenges—racial discrimination—prima facie case not established**

Defendant failed to establish a prima facie case of racial discrimination against black citizens by the State's exercise of peremptory challenges in this first degree murder and common law robbery case where the State excused eight black venirepersons by exercising peremptory challenges and accepted three as jurors; the State excused six white venirepersons by peremptory challenges; three of the first four jurors seated were black; both defendant and the victim were black; the State's questions during voir dire centered on the prospective juror's feelings about capital punishment and the age of the juror or his or her children as compared as to the age of defendant, who was eighteen when the victim was killed and twenty at the time of trial; the venirepersons were brought into the courtroom individually, so neither the State nor the defendant knew how many black citizens were present in the venire or whether a black or white citizen would be examined next; defendant's failure to object to any specific exercise of

STATE v. DAVIS

[325 N.C. 607 (1989)]

peremptory challenges by the State after defendant had raised this issue in a pretrial motion supports an inference that he failed to object, not out of ignorance of the substantive issue, but because he did not in fact believe the State was exercising its peremptory challenges in a discriminatory manner; and defendant failed to demonstrate prejudice because he had exercised only nine of his fourteen peremptory challenges when the twelfth juror was seated and had yet to exercise three of his peremptory challenges when he passed the second alternate and last juror who deliberated in the case.

**Am Jur 2d, Jury § 235.**

3. **Constitutional Law § 60 (NCI3d); Jury § 7.14 (NCI3d) — peremptory challenges — exclusion of blacks — fair cross section right not violated**

The prosecutor's use of peremptory challenges against black citizens did not deprive defendant of his right to a trial by an impartial jury composed of a fair cross section of the community.

**Am Jur 2d, Jury § 235.**

4. **Constitutional Law § 60 (NCI3d); Jury § 7.14 (NCI3d) — peremptory challenges — exclusion of blacks — failure to show State constitutional violation**

Defendant failed to establish that the prosecutor's use of peremptory challenges violated Art. I, § 26 of the N. C. Constitution where he failed to show that any of the black citizens in the venire were excluded from jury service on account of their race.

**Am Jur 2d, Jury § 235.**

5. **Jury § 6.3 (NCI3d) — voir dire — disallowance of questions staking out juror**

A hypothetical question asked a single prospective juror as to whether the juror would consider the fact that defendant had no significant history of any criminal record as important in determining whether to impose the death penalty was properly excluded by the trial court as an impermissible attempt to indoctrinate a prospective juror regarding the existence of a mitigating circumstance.

**Am Jur 2d, Jury §§ 203, 289, 290.**

STATE v. DAVIS

[325 N.C. 607 (1989)]

6. **Constitutional Law § 60 (NCI3d); Jury § 7.11 (NCI3d) — capital punishment views — excusal of jurors for cause**

The trial court did not err in excusing two jurors for cause because of their capital punishment views, although the jurors gave conflicting answers to questions concerning those views, where one juror stated at various times that he did not believe in the death penalty, could not vote to impose it, and could not act as an impartial juror in the guilt phase, and the second juror's answers reveal that he wanted to follow the law but thought his views on capital punishment would interfere with the performance of his duties during the sentencing phase. N.C.G.S. § 15A-1212(8) (1988).

**Am Jur 2d, Jury §§ 203, 289, 290.**

7. **Jury § 7.14 (NCI3d) — peremptory challenges — use because of death penalty views**

The prosecutor's use of peremptory challenges to exclude potential jurors expressing reservations about capital punishment did not violate defendant's constitutional rights.

**Am Jur 2d, Jury § 235.**

8. **Jury § 6.4 (NCI3d) — voir dire — exclusion of question concerning death penalty — no plain error or prejudice**

The trial court did not commit plain error by failing to intervene without objection by defendant when the prosecutor asked a prospective juror whether she could vote to recommend the death penalty "even knowing your decision would mean that defendant might eventually be put to death?" Furthermore, defendant was not prejudiced because voir dire was conducted individually and the prospective juror did not participate in deliberations in this case but was excused during the trial. Amendment I of the U. S. Constitution; Art. I, § 26 of the N. C. Constitution.

**Am Jur 2d, Jury § 229.**

9. **Jury § 7.11 (NCI3d) — opposition to capital punishment — religion as basis — exclusion for cause proper**

The exclusion of a prospective juror for cause because of his opposition to the death penalty based on his religious beliefs did not violate constitutional principles regarding the free exercise of religion and the right to serve as a juror

regardless of one's religion. The prospective juror was excused, not because of his choice of religion, but because of his inability to follow the law, and the fact that his religion provided the basis for his views did not alter the propriety of excluding him for cause.

**Am Jur 2d, Jury §§ 283, 289.**

10. **Constitutional Law § 66 (NCI3d)— judge's telephone communications with juror—absence of defendant—harmless error**

If it was error for the trial judge to communicate with a juror by telephone outside the presence of defendant, the absence of defendant during the telephone conversations was harmless beyond a reasonable doubt where defendant's counsel was present during both calls; the judge reiterated for the record the content of the calls; the juror with whom the judge communicated was excused and did not deliberate in defendant's case; and the incident took place in the judge's chambers.

**Am Jur 2d, Criminal Law § 919.**

11. **Jury § 9 (NCI3d)— juror with child care problems—replacement with alternate**

The trial court in a first degree murder case did not abuse its discretion in removing a juror who had child care problems and replacing her with an alternate juror.

**Am Jur 2d, Trial § 1096.**

12. **Homicide § 18.1 (NCI3d)— first degree murder—sufficient evidence of premeditation and deliberation**

The evidence in a first degree murder case allowed a reasonable inference that defendant premeditated and deliberated before killing the victim where it permitted the jury to find that defendant targeted a vulnerable elderly victim, felled her with blows, assaulted her sexually, and manually strangled her until she died.

**Am Jur 2d, Homicide §§ 438, 439.**

13. **Homicide § 25.2 (NCI3d)— proof of premeditation and deliberation—examples in jury instructions—supporting evidence**

The evidence supported each of the examples given by the trial court in its instructions regarding proof from which

STATE v. DAVIS

[325 N.C. 607 (1989)]

premeditation and deliberation may be inferred. The victim's weakened condition and defendant's physical integrity on examination constituted evidence of lack of provocation; defendant's conduct in leaving the scene of the assault and callously selling the victim's personal belongings constituted evidence from which premeditation could be inferred; and the nature and extent of the victim's injuries related to the remaining factors listed in the jury charge.

**Am Jur 2d, Homicide §§ 439, 501.**

14. **Robbery § 4.2 (NCI3d) — common law robbery — force or violence element — sufficiency of evidence**

The State's evidence was sufficient for the jury to find that defendant took items from a murder victim's apartment by force and violence rather than as an afterthought following the murder, and thus was sufficient to support defendant's conviction of common law robbery, where the evidence tended to show that the victim's apartment was "a mess" and "in total disarray" although the victim usually kept her apartment neat and clean, and the evidence would permit a reasonable inference that defendant engaged in a purposeful search of the victim's apartment, at least part of which occurred in her presence against her will and by putting her in fear, culminating in removal of a radio and a ring.

**Am Jur 2d, Robbery §§ 14, 28.**

15. **Robbery § 5.4 (NCI3d) — common law robbery — instruction on misdemeanor larceny not required**

The trial court in a common law robbery case did not commit plain error in failing to instruct on misdemeanor larceny where the disheveled condition of the victim's apartment, coupled with evidence of violent force displayed by the victim's body, suggest that a robbery rather than a larceny was committed, and where no affirmative evidence was presented that defendant took the victim's belongings only as an afterthought and that the violence committed against her served no intimidating purpose.

**Am Jur 2d, Robbery § 75.**

**16. Criminal Law § 1339 (NCI4th) — first degree murder — aggravating factors — common law robbery and pecuniary gain — prejudicial error in submission of both**

The trial court in a first degree murder case committed prejudicial error in submitting both the statutory aggravating factor that defendant was engaged in the commission of common law robbery and the statutory factor that the murder was committed for pecuniary gain where all the evidence in the case showed that defendant committed the robbery for pecuniary gain, *i.e.*, to resell the victim's ring and radio for cash.

**Am Jur 2d, Homicide §§ 72, 498, 534.**

**17. Criminal Law §§ 1160, 1167 (NCI4th) — robbery — victim's age and physical infirmity as separate aggravating factors**

The trial court did not err in finding as discrete aggravating factors for common law robbery that the victim was very old and that she was physically infirm. The vulnerability accompanying advanced age is not caused by physical disability alone, but encompasses the slowing of reflexes and lessening acuity of senses which render older citizens relatively defenseless against predators looking for unprotected targets. Evidence that the seventy-year-old victim lived alone in an apartment building for the elderly and that defendant knew the victim well and was thus in a position to assess her vulnerability, discrete from evidence of the victim's physical infirmity, supported the aggravation of the robbery by virtue of the victim's age.

**Am Jur 2d, Homicide § 552.**

Justice MARTIN dissenting in part.

Justices MEYER and MITCHELL join in this dissenting opinion.

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing the sentence of death entered by *Read, J.*, at the 7 October 1985 Criminal Session of Superior Court, WAKE County. Heard in the Supreme Court 12 September 1989.

*Lacy H. Thornburg, Attorney General, by William P. Hart, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of murder in the first degree and common-law robbery. The jury recommended the death sentence for the murder, and the trial court sentenced accordingly. It imposed a sentence of ten years imprisonment for the robbery. Because we find prejudicial error in the sentencing phase on the murder charge, we remand for a new capital sentencing hearing. We find no error on the robbery charge.

The State's evidence tended to show that the victim, Vivian Whitaker, was murdered in her apartment on 1 March 1984. She was last seen alive as she entered her apartment at 4:00 or 4:30 p.m. Officer Karpovich of the Raleigh Police Department testified that at approximately 8:00 p.m. that evening he received a call to go to the Carriage House Apartments. He was met there by Betty Davis, defendant's mother, who escorted him to the victim's apartment. The door was unlocked and showed no signs of forcible entry. The victim lay face up in the middle of the living room floor. An emergency medical technician ascertained that the victim was dead, and Officer Karpovich secured the scene. The apartment was "in total disarray."

Investigator Parker of the Raleigh Police Department testified that the victim's apartment appeared disheveled, with some items lying on the floor and others turned over. Parker identified several items which were introduced into evidence and later identified as belonging to the victim: a radio, a green cigarette case and disposable cigarette lighter, and a gold ring with seven stones. The cigarette lighter and a pack of Virginia Slims cigarettes were taken from defendant after his arrest on 2 March 1984. Following his arrest, defendant was examined for bruises, scratches, or some other indication that he might have been in a fight. No marks were found on defendant's person.

Doris Brown testified that she lived in the Carriage House Apartments, a building for senior citizens and handicapped persons. She was acquainted with defendant because his mother lived in

the building. On 1 March 1984 at 6:25 p.m., she saw defendant enter the elevator at the Carriage House Apartments. As she stood by the elevators reading the bulletin board, she saw the light over the elevator doors indicate that the elevator went to the fourth floor. The elevator returned to the ground floor without passengers. Defendant's mother lived in Apartment 411 at the time. The victim lived in Apartment 405. Gilbert Brown corroborated his wife's testimony.

Beatrice Randolph lived in Apartment 414 on 1 March 1984. She heard the door to the back stairway exit slam once at 6:30 or 6:45 p.m. On cross-examination, she admitted that she was uncertain about the time the door slammed, and that she had told a police officer earlier that she heard the noise at around 8:30 p.m.

Mrs. Artis Sears lived in Apartment 410, diagonally across the hall from Apartment 411, where defendant's mother, Mrs. Davis, lived. Mrs. Sears testified that she had excellent hearing. On the evening of 1 March 1984 she heard a man and a woman speaking rapidly and excitedly. She recognized the woman's voice as belonging to Mrs. Davis. After five or six minutes of conversation, she heard the back fire exit door slam; she then heard another door, closer to her apartment, open and close and the lock and chain go on the door. She estimated that this occurred between 7:00 and 8:00 p.m.

Mr. Franklin Cherry testified that on 1 March 1984 he was visiting his mother's apartment on the third floor of the Carriage House Apartments. At about 6:15 he heard some noise coming from the floor above. First he heard something vibrating or dragging across the floor. The noise lasted for two or three minutes. Then he heard a lady's voice saying something like, "Stop, stop, go on, go on," or "Stop, help."

Detective Munday of the Raleigh Police Department testified that he retrieved the victim's cigarette case from her apartment the day after the murder. The cigarette case was empty.

Deborah Sanders testified that defendant came to her mother's house after dark on the evening of the murder. He was trying to sell a radio and a ring. Ms. Sanders bought the ring for a dollar and her mother bought the radio. A few days later a police officer took the ring from her. The ring and radio were the same ones identified by Detective Parker. Mrs. Mary Primous testified

she bought the radio from defendant for two dollars. After she learned defendant had been arrested, she called the police and gave them the radio.

Ronald Thorp, the victim's grandson, testified that he saw defendant at the time defendant sold the ring and radio to Mrs. Primous and Ms. Sanders. This was between 8:00 and 9:00 p.m. Defendant was so nervous and shaky that when he wanted to use the telephone, someone else had to dial for him. After Thorp heard about the murder, he contacted the police. Thorp identified the cigarette case introduced into evidence as the one the victim always carried with her. The victim usually kept her apartment neat and clean; it was never disheveled with furniture turned over and items strewn about, as shown in the photographs introduced into evidence.

Agent Hallisey lifted latent fingerprints from various items in the victim's apartment, including a jewelry box, a coffee can lid sitting in the middle of a closet floor, a newspaper found underneath the victim's body, the telephone, and a green cigarette case. The latent fingerprints from the jewelry box and coffee can lid, and two fingerprints and three palm prints from the newspaper, were positively identified as defendant's.

Silas James Johnson testified that the victim had been his girlfriend for fifteen years. He visited her in her apartment every other night. He visited her the day before her murder, but the couple did not engage in sexual relations on that day.

Peggy Graham, the victim's daughter, testified that the cigarette lighter introduced into evidence was one that she bought for the victim. The victim usually smoked Virginia Slims cigarettes. Rufus Whitaker, Jr., testified that he bought the ring for the victim, his mother, that defendant later sold to Deborah Sanders. Another of the victim's sons, James Whitaker, also identified the ring and radio introduced into evidence as belonging to his mother.

Melba Thorp, the victim's daughter, testified that the victim kept some money and jewelry in the coffee can found in a closet. Her mother used a cane to walk because she had suffered a stroke a few years earlier. The stroke left her with a limp. The victim was seventy years old.

Dr. Gordon Legrand, a pathologist, testified that he performed an autopsy on the victim's body. Several abrasions were located

**STATE v. DAVIS**

[325 N.C. 607 (1989)]

on either side of her neck. A linear abrasion and an area of bruising were located on her left jaw. Two puncture wounds surrounded by bruising were located at the back of the neck, probably caused by fingernails digging into the flesh. The victim's hyoid bone and thyroid cartilage were fractured and the muscles and soft tissue in the neck revealed evidence of trauma. In Dr. Legrand's opinion, these injuries to the neck area were caused by manual strangulation. Sixteen of the victim's ribs were broken and one of the ribs had punctured the left lung, resulting in bleeding into the lining of the lung. Chest muscles had hemorrhaged extensively. The left lobe of the liver was torn away from the rest of the liver, resulting in bleeding into the abdominal cavity. The esophageal opening in the diaphragm was enlarged and torn. All these injuries were caused by blunt trauma, probably three blows. The manual strangulation caused the victim's death, with the traumatic injuries contributing to the death. Judging from the atrophied state of the muscles, Dr. Legrand opined that the victim had been in a weakened condition at the time of her death.

Ms. Jona Medlin testified that vaginal and rectal smears taken from the victim revealed the presence of spermatozoa. In Ms. Medlin's opinion as a forensic serologist, the spermatozoa had been deposited recently at the time of collection.[1]

Defendant did not offer evidence during the guilt phase of his trial, but moved to dismiss the charges of common-law robbery and first-degree murder at the close of the State's evidence. The trial court denied the motion. The jury found defendant guilty of common-law robbery and first-degree murder, basing the latter conviction on theories of both premeditation and deliberation and felony murder.

Following a capital sentencing hearing, the jury found the following aggravating circumstances: defendant was engaged in the commission of common-law robbery, the murder was committed for pecuniary gain, and the murder was especially heinous, atrocious, or cruel.

The jury found twenty-five mitigating circumstances. Among these were the following statutory circumstances: defendant had

---

1. The vaginal and rectal swabs were collected by the medical examiner after death but were not analyzed until the trial was underway. Defendant was not indicted or tried on charges of rape or sexual offense.

no significant history of prior criminal activity, the murder was committed while defendant was under the influence of mental or emotional disturbance, defendant's capacity to appreciate the criminality of his conduct or to conform to the requirements of the law was impaired, and defendant's age at the time of the murder. The remaining nonstatutory mitigating circumstances pertained to the abuse and neglect defendant suffered during childhood, defendant's good conduct during and since his arrest, defendant's amenability to rehabilitation, defendant's mental condition, and his minimal history of criminal activity.

Upon finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, and that the aggravating circumstances were sufficiently substantial to call for the death penalty, the jury recommended a sentence of death.

JURY SELECTION ISSUES

Defendant first assigns error to the trial court's denial of his motion to prohibit the State from exercising peremptory challenges in a racially discriminatory manner. Defendant asserts that this denial, and the prosecutor's subsequent use of peremptory challenges in an allegedly discriminatory fashion, violated his rights to equal protection and trial by an impartial jury under the sixth, eighth, and fourteenth amendments of the United States Constitution and under article I, sections 19, 24, and 26 of the North Carolina Constitution. We address the equal protection claim first.

[1] Defendant was tried prior to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), which established that a criminal defendant's right to equal protection of the laws includes a prohibition against the prosecutor's use of peremptory challenges to exclude persons from the jury solely on account of their race. *Batson* applies retroactively to cases pending on direct appeal at the time it was decided, *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649 (1987), and thus applies to this case. The State asks that we consider the *Batson* issue procedurally barred because, although defendant filed a pretrial motion to prohibit the State from exercising its peremptory challenges in a racially discriminatory fashion, he did not object to the denial of the motion, nor did he object to the State's exercise of any specific peremptory challenge of a black juror, nor did he object generally at the conclusion of jury selection. Normally, these omissions would preclude consideration of this issue. N.C.G.S. § 15A-1446(a) (1988); *State v. Robbins*, 319 N.C. 465, 488,

356 S.E.2d 279, 293, *cert. denied,* 484 U.S. 918, 98 L. Ed. 2d 226 (1987). However, as we stated in *Robbins,* "we find it difficult to hold that defendant has waived a right which he did not know existed at the time of trial. Moreover, where the defendant was, as here, on trial for his life, we ordinarily feel compelled to consider his argument." *Id.* In *Robbins,* defendant failed to raise the issue of discrimination in jury selection by objection or challenge; in the present case, defendant raised the issue initially by motion but failed to object to its denial. Defendant thus did more than the defendant in *Robbins* to alert the trial court to the issue, and we therefore elect to consider it. *See* N.C.G.S. § 15A-1446(b) (1988).

A criminal defendant may establish a prima facie case of invidious racial discrimination upon showing the following: first, that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove persons of defendant's race from the venire. *Batson,* 476 U.S. at 96, 90 L. Ed. 2d at 87. Defendant is black, as were eight members of the venire against whom the prosecutor exercised peremptory challenges.

> Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury, on account of their race.

*Id.* at 96, 90 L. Ed. 2d at 87-88 (citations omitted).

[2] In the present case, viewing the jury as originally impanelled,[2] the parties and the court examined seventy-nine venirepersons before impanelling twelve jurors and three alternates. The court called eighteen black citizens into the jury box and excused seven for cause. The court tendered eleven black citizens to the State. The State excused eight black venirepersons by exercising peremptory challenges and accepted three as jurors. The State excused six white citizens peremptorily. Defendant argues that

---

2. One black juror was excused during the trial and replaced by a white alternate. A white juror was excused for medical reasons prior to trial and was replaced by a white alternate. The third alternate did not deliberate in the case.

this evidence establishes a prima facie case of racial discrimination in the State's exercise of its peremptory challenges. We disagree.

The State's questions during voir dire centered on two subjects: the prospective juror's feelings about capital punishment, and the age of the juror, or his or her children, as compared with defendant's age. Defendant was eighteen when the victim was killed and twenty at the time of trial. The State exercised five of its peremptory challenges to excuse white jurors with reservations about capital punishment. It exercised another peremptory challenge to excuse a white female who planned to leave on vacation in two weeks. In addition, a worker's compensation case involving the death of this woman's husband had been tried in the courtroom where the voir dire was conducted, and the woman found this circumstance emotionally trying.

Focusing on the State's use of peremptory challenges to remove black citizens from the venire, the record establishes that the State exercised peremptory challenges against two such citizens, John Stephens and Mildred Richardson, who harbored reservations about voting to impose a death sentence. Robert Jeffreys was excused after stating that he had three grown children and had served on a jury within the last three or four years. The State excused Milton Jones after he stated he had four children ranging in age from sixteen to twenty-one, and that he did not know whether it was his company's policy to pay employees for time spent on jury duty. The State excused Otis Ingram, a twenty-year-old black male, after asking if it would trouble Ingram that he was so close in age to defendant. Ingram said it would not, and the State thereafter excused him peremptorily. Gloria Nwafor worked with mentally retarded patients at Dorothea Dix. The State elicited from her that she had experience with schizophrenic and psychopathic patients, as well as with youth with drug and alcohol problems, before excusing her peremptorily. Norwood Peacock expressed "some doubt" about voting to impose the death penalty, and admitted that having three children whose ages were near that of defendant would bother him. Oscar Myers stated that he had six children living in New York. In considering whether he could vote to impose a sentence of death, Myers stated he "would have to go along with the majority of the jury."

In addition to the facts described above, we consider the following facts and circumstances relevant in discerning whether the record establishes a prima facie case of racial discrimination:

Three of the first four jurors seated were black. As in *Robbins*, the venirepersons were brought into the courtroom individually, so neither the State nor the defendant knew how many black citizens were present in the venire or whether a black or white citizen would be examined next. Both the victim and defendant were black, thus diminishing the likelihood that "racial issues [were] inextricably bound up with the conduct of the trial." *Robbins*, 319 N.C. at 491, 356 S.E.2d at 295. In arguing defendant's pretrial motion, counsel explained that the motion was in the nature of a motion in limine and was not meant to suggest that these prosecutors had a propensity toward racial discrimination. Counsel stated, "I have no reason to believe that Mr. Hart will do this because I have no record of his having done it in the past." This statement, coupled with the State's acceptance of black jurors for three of the first four seats, and viewed in the light of defendant's failure to object to any specific exercises of peremptory challenges by the State, do not raise an inference of racial discrimination. Defendant's failure to press forward with the *Batson* issue after initially raising it supports an inference that he failed to object, not out of ignorance of the substantive issue, but because he did not in fact believe the State was exercising its peremptories in a discriminatory manner.

Finally, we note that when the twelfth juror was seated, defendant had exercised only nine of his fourteen peremptory challenges. When defendant passed the second alternate and last juror who deliberated in the case, he had yet to exercise three of his remaining peremptory challenges. Defendant therefore has failed to demonstrate prejudice. *Robbins*, 319 N.C. at 495, 356 S.E.2d at 297. The relevant facts and circumstances in the record fail to establish a prima facie case of racial discrimination against black citizens during jury selection.

[3] We next address defendant's claim that the prosecutor's use of peremptory challenges against black citizens deprived him of his right to a trial by an impartial jury composed of a fair cross section of the community. The United States Supreme Court has refused to extend fair cross section principles to invalidate the use of either for-cause or peremptory challenges in petit jury selection, characterizing this refusal as "a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly 'representative' petit jury . . . ." *Lockhart v. McCree*, 476 U.S. 162, 174, 90 L. Ed. 2d 137, 148 (1986). The sixth amendment protects defendants by requiring "the presence

of a fair cross section of the community on venires, panels, or lists *from which petit juries are drawn . . . .*" *Taylor v. Louisiana*, 419 U.S. 522, 526, 42 L. Ed. 2d 690, 696 (1975) (emphasis added). The United States Supreme Court has stated, however: "[I]n holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* at 538, 42 L. Ed. 2d at 703. We adhere to this reasoning, and we thus overrule this assignment of error insofar as it rests on this ground. *State v. Fullwood*, 323 N.C. 371, 382, 373 S.E.2d 518, 525 (1988).

[4] As a final ground, defendant asserts that the prosecutor's use of peremptory challenges violated article I, section 26 of the North Carolina Constitution, which provides: "No person shall be excluded from jury service on account of sex, race, color, religion, or national origin." However, as discussed above under equal protection analysis, we are unable to conclude from the record that any of the black citizens in the venire were excluded from jury service on account of their race. Defendant therefore has failed to establish a state constitutional violation. This assignment of error is overruled.

[5] Defendant next argues that the trial court abused its discretion in sustaining the prosecutor's objection to the following question asked of a single prospective juror: "Would the fact that the defendant had no significant history of any criminal record, would that be something that you would consider important in determining whether or not to impose the death penalty?" No evidence of defendant's criminal history had been introduced at this point. The question therefore was hypothetical and the trial court properly could view it as an impermissible attempt to indoctrinate a prospective juror regarding the existence of a mitigating circumstance. *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989); *State v. Avery*, 315 N.C. 1, 20, 337 S.E.2d 786, 797 (1985). Defendant has shown no abuse of discretion. This assignment of error is without merit.

[6] Defendant contends that the trial court erred in excusing two jurors for cause because of their views on capital punishment, thereby denying defendant his rights under the sixth, eighth, and fourteenth amendments to the United States Constitution. The standard for determining when a potential juror may be excluded for

cause because of his views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). The Court emphasized in *Wainwright* that the standard

> does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424-26, 83 L. Ed. 2d at 852-53.

The transcript reveals that Leon Newkirk, the first juror, stated that he did not believe in capital punishment. In response to the prosecutor's question whether he would "be unable to vote to recommend the death penalty under any circumstances," he responded affirmatively. In response to the question, "[N]o matter how much evidence the State presented to try to show you how bad a murder was, how aggravated it was, but never would you go back into that jury room and vote to recommend the death penalty," Mr. Newkirk responded, "It depends on how, you know, how, how it was. How it happened and everything. The evidence." The prosecutor again asked him whether he could vote to impose the death penalty, and he responded, "Okay, no." Mr. Newkirk then agreed to the prosecutor's suggestion that he would be unable "to be a fair and impartial juror in the trial stage where we determine the guilt or innocence of the defendant." On rehabilitative questioning by defendant, Mr. Newkirk agreed with counsel's suggestion that he did not "have a problem with [following instructions]

STATE v. DAVIS

[325 N.C. 607 (1989)]

on guilt or innocence." He then agreed that he could "consider all of the aggravating factors that are presented . . . and consider all the mitigating factors." When asked whether he could set aside his personal biases, Mr. Newkirk responded, "I have to stick with my beliefs, my personal beliefs."

Francis McFarland, the second juror, stated from the outset that he would be unable to vote to recommend a death sentence, though he did not believe his views would impair his ability to sit as a juror during the guilt phase of the trial. He agreed that his beliefs would significantly impair his ability to perform the functions of a juror and that "no matter how bad the murder would be or how bad the defendant was," under no circumstances would he ever vote to impose the death penalty. He stated he did not want to be put in the position of having to vote for a death sentence if the State met its burden of proof during the sentencing phase. Under rehabilitative questioning, Mr. McFarland reiterated several times that he would automatically favor a life sentence. Defense counsel then asked:

Q: In other words, if you even follow the law, you could find some way to avoid the death penalty. Is that a fair statement?

A: Not necessarily. That's a problem with me.

Q: Okay.

A: If the law, if all the parts of those three points are within the law —

Q: Right.

A: —and they point directly to the death penalty, I would have to follow the death penalty, but that would be something that would be against my subjective decision.

The questioning continued in this vein, with Mr. McFarland stating, "I'd have to follow the law but I wouldn't like it at all," and that he was still unsure whether he could vote to impose the death sentence. Finally, the trial court asked Mr. McFarland: "[D]o you feel that [your own personal views about capital punishment] would prevent or substantially impair the performance of your duties as a juror in accordance with your instructions and your oath?" Mr. McFarland responded, "I think it would if it came to that point where I had to make that decision."

STATE v. DAVIS

[325 N.C. 607 (1989)]

The conflicting answers given by these prospective jurors illustrate clearly the United States Supreme Court's conclusion that a prospective juror's bias may, in some instances, not be provable with unmistakable clarity. In such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially. Mr. Newkirk stated at various times that he did not believe in the death penalty, could not vote to impose it, and could not act as an impartial juror in the guilt phase. Mr. McFarland's answers reveal that he wanted to follow the law, but thought his views on capital punishment would interfere with the performance of his duties during the sentencing phase. The trial court did not err in excusing either man for cause because neither could affirmatively agree to follow the law in carrying out his duties as a juror. N.C.G.S. § 15A-1212(8) (1988); *State v. Brown*, 320 N.C. 179, 189-90, 358 S.E.2d 1, 10, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). This assignment of error is overruled.

[7] Defendant next argues that the prosecutor's use of peremptory challenges to exclude potential jurors expressing reservations about capital punishment violated his constitutional rights. Defendant recognizes that this issue has been decided adversely to his position, *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855 (1988), but asks this Court to reconsider its position in light of *Brown v. Rice*, 693 F. Supp. 381 (W.D.N.C. 1988). We decline this invitation, as we continue to adhere to the view expressed by Justice O'Connor in her concurrence to the denial of certiorari in *Brown v. North Carolina*, 479 U.S. 940, 93 L. Ed. 2d 373 (1986) (O'Connor, J., concurring). She wrote:

> *Batson* does not touch, indeed, it clearly reaffirms . . . the ordinary rule that a prosecutor may exercise his peremptory strikes for any reason at all. . . . It is central to *Batson* that a "person's race simply 'is unrelated to his fitness as a juror.' " . . . There is no basis for declaring that a juror's attitudes towards the death penalty are similarly irrelevant to the outcome of a capital sentencing proceeding.

*Id.* at 941, 93 L. Ed. 2d at 374 (citations omitted) (quoted in part in *Robbins*, 319 N.C. at 494, 356 S.E.2d at 296-97). Accordingly, we overrule this assignment of error.

[8] Defendant next contends that the trial court committed plain error by failing to intervene, absent objection by defendant, in

STATE v. DAVIS

[325 N.C. 607 (1989)]

response to a question asked by the prosecutor. The prosecutor asked Judy Richardson whether she could vote to recommend the death penalty "even knowing your decision would mean that the defendant might eventually be put to death?" Defendant argues that the wording of this question impermissibly suggested to the juror that a sentence of death might not be carried out, thus diminishing the juror's sense of personal responsibility for the decision whether to execute defendant. However, the cases defendant cites in support of his position are inapposite. *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231 (1985), and *State v. Jones*, 296 N.C. 495, 251 S.E.2d 425 (1979), both involve sentencing proceeding arguments in which the prosecutor informed the jury that death penalty cases are reviewed automatically by an appellate court. In *State v. Dockery*, 238 N.C. 222, 226, 77 S.E.2d 664, 667 (1953), also cited by defendant, the prosecutor argued to the jury, "There is no such thing as life imprisonment in North Carolina today." None of these cases address the propriety of a single voir dire question, which is the issue here. In any event, defendant can demonstrate no prejudice because Ms. Richardson did not participate in the deliberations in this case, but was excused during the trial due to the illness of her child. Voir dire was conducted individually, so no juror other than Ms. Richardson heard the allegedly impermissible question. We can perceive no plain error and no prejudice to defendant from the asking of this question.

[9] Defendant next argues that the trial court erred in removing a prospective juror for cause based on his opposition to capital punishment on religious grounds. Paul Dunn stated that based on the teachings of the Catholic Church, he would be unable to follow the law and consider voting to impose a death penalty no matter what circumstances the case encompassed. This conviction clearly mandated his removal for cause under the *Wainwright* test discussed above. Nevertheless, defendant argues that because the venireman's opposition to the death penalty stemmed from his religious beliefs, his exclusion from the jury violated constitutional principles regarding the free exercise of religion and the right to serve as a juror regardless of one's religion. U.S. Const. amend. I; N.C. Const. art. I, § 26. We disagree. The transcript establishes beyond peradventure that Dunn was excused, not because of his choice of religion, but because of his inability to follow the law. The fact that the prospective juror's religion provided the basis

STATE v. DAVIS

[325 N.C. 607 (1989)]

for his views did not alter the propriety of excluding him for cause. We find no merit in this assignment of error.

GUILT PHASE ISSUES

Defendant assigns error to the trial court's communication with a juror outside the presence of defendant and to the court's subsequent removal of that juror. After the prosecution had presented all its evidence and the attorneys had completed their closing arguments, court recessed for the evening. The next morning, prior to court reconvening, juror Judy Richardson telephoned the jury pool room clerk to say that her child was ill and she had no child care available for the day. The clerk gave this message to the judge. The judge conferred with counsel, then telephoned the juror from his chambers in the presence of the attorneys for both the defendant and the State. The juror explained that her son had a severe case of poison ivy which prohibited him from attending school, and that she had no one to stay with him that day. The judge asked her to try to find child care and told her he would call back in thirty minutes. He did so, again in the presence of counsel, and the juror stated that she was unable to find anyone to stay with the child. The judge then recapitulated the foregoing events for the record, stating his intention to replace the juror with an alternate, and invited defendant to make his objections.

Defendant moved for a recess of one day to allow the sitting juror to find child care. He emphasized that, during selection of the alternates, his peremptory challenges were nearing exhaustion, and he was unable to scrutinize prospective jurors to the same extent that he had when he passed the sitting juror, who was the first juror picked for the case. Defendant also voiced concern that excusing the sitting juror increased the chance that the third alternate, accepted over his objection after he had exhausted his peremptory challenges, might actually deliberate in the case (he did not in fact deliberate).

The judge denied defendant's motion, stating that the trial had been going on since 7 October, it then being 31 October, and he was

> not inclined to send fourteen jurors back home today without doing anything. We have an alternate available and we have a statutory procedure that provides for this. . . . [The juror] herself stated to me that she has concern that she would be

able to keep her mind on her duty today and I am not going to recess this trial until tomorrow morning to see what the situation is at that time. The child could be worse tomorrow morning for all I know.

[10] We first must determine whether the trial court erred in communicating with the juror by telephone, in the presence of counsel, but outside the presence of defendant. Defendant's constitutional right to confront the witnesses against him dictates that he be present at every stage of his trial; in a capital trial, this right may not be waived. *State v. Huff*, 325 N.C. 1, 30-31, 381 S.E.2d 635, 651 (1989). "[T]his constitutional requirement of defendant's presence at his capital trial protects not only the defendant, but public interests as well . . . . The requirement . . . protects the integrity of the system by preserving the appearance of fairness and by optimizing the conditions for finding the truth." *Id.* at 30, 381 S.E.2d at 651. Assuming the telephone conversation with the juror is properly denominated as a stage of defendant's trial, the trial court had a duty to insure defendant's presence. *Id.* at 30-31, 381 S.E.2d at 651. The error, if any, is subject to harmless error analysis, however. *Id.* at 32, 381 S.E.2d at 653. We hold that if it was error, defendant's absence during the telephone conversations was harmless beyond a reasonable doubt. Defendant's counsel was present during both calls. The judge reiterated for the record the content of the calls. These facts assuage our concern for "optimizing the conditions for finding truth." *Id.* at 30, 381 S.E.2d at 651. Unlike in *State v. Payne*, 320 N.C. 138, 357 S.E.2d 612 (1987), defendant's absence did not come at a critical stage in the case when his presence "could have had a reasonably substantial relation to his ability to present a full defense." *Payne*, 320 N.C. at 139, 357 S.E.2d at 612. The juror with whom the judge communicated outside defendant's presence did not deliberate in defendant's case, so any untoward influence resulting from defendant's absence could not have been conveyed to the remaining jurors during deliberations, but was confined to that juror. Because the incident took place in the judge's chambers, the appearance of fairness was not impermissibly compromised. As a practical matter, the trial judge showed commendable concern for safeguarding the integrity of the system and the appearance of fairness by taking the call after consulting with counsel and in the presence of counsel. His failure to insure defendant's presence may be regarded as an example of the "virtually inevitable presence of immaterial er-

ror" which does not require reversal on appeal. *Huff*, 325 N.C. at 32, 381 S.E.2d at 653 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 89 L. Ed. 2d 674, 685 (1986)).

[11] We next consider whether the trial court abused its discretion in removing the juror and replacing her with an alternate. A defendant "is not entitled to a jury of his choice and has no vested right to any particular juror." *State v. McKenna*, 289 N.C. 668, 681, 224 S.E.2d 537, 546 (juror excused peremptorily after being accepted but before jury impanelled), *vacated on other grounds*, 429 U.S. 912, 50 L. Ed. 2d 278 (1976). The trial court's discretion in supervising the jury continues beyond jury selection and extends to decisions to excuse a juror and substitute an alternate. *State v. Nelson*, 298 N.C. 573, 593, 260 S.E.2d 629, 644 (1979) (juror replaced because could not appear on Saturday), *cert. denied*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980). "These kinds of decisions relating to the competency and service of jurors are not reviewable on appeal absent a showing of abuse of discretion, or some imputed legal error." *Id.* (quoted in *State v. Allen*, 323 N.C. 208, 224, 372 S.E.2d 855, 864 (1988)). We ascertain no abuse of discretion in the judge's decision to replace a juror who had child care problems. This assignment of error is overruled.

[12] Defendant next maintains that the trial court erred in denying his motion to dismiss the charge of first-degree murder, as the evidence was insufficient to allow a reasonable inference of premeditation and deliberation culminating in a specific intent to kill. When the State relies on a theory of premeditation and deliberation for first-degree murder, it must prove as necessary elements of the crime that defendant premeditated and deliberated before killing the victim. *State v. Vaughn*, 324 N.C. 301, 305, 377 S.E.2d 738, 740 (1989). Premeditation means that the defendant thought out the act beforehand for some length of time, however short. *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814, 827 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* "Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence." *Id.* Among other circumstances to be considered in determining

**STATE v. DAVIS**

[325 N.C. 607 (1989)]

whether a defendant acted after premeditation and deliberation are lack of provocation by the victim, the dealing of lethal blows after the deceased has been felled, evidence that the killing was done in a brutal manner, and the nature and number of the victim's wounds. *Id.*

In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference from the evidence. *Id.* at 22, 343 S.E.2d at 827. The evidence in this case allows a reasonable inference that defendant premeditated and deliberated before killing the victim. The victim was in a weakened condition prior to her death. A woman's voice was heard calling out in distress from the vicinity of her apartment. The victim was killed by manual strangulation, compounded by blunt traumatic blows causing extensive injury to her internal organs. She was found lying on her back on the floor. Spermatozoa were found in her vagina and rectum. Defendant was examined following his arrest, the day after the murder, for bruises, scratches, or other indications that he had been in a fight; none were discovered. Defendant sold the victim's radio and ring for a total of three dollars within a few hours of the murder. This circumstantial evidence allows a reasonable inference that defendant targeted a vulnerable victim, felled her with blows, assaulted her sexually, and manually strangled her until she died. The trial court did not err in denying defendant's motion to dismiss, and this assignment of error is accordingly overruled.

[13] In a related assignment of error, defendant contends that the trial court's charge to the jury regarding proof from which premeditation and deliberation may be inferred contained examples unsupported by the evidence. The trial court gave the following instruction after defining premeditation and deliberation:

Neither premeditation or deliberation is usually susceptible of direct proof. They may be proved by proof of circumstances from which they may be inferred, such as the lack of provocation by the victim, conduct of the defendant before, during and after the killing, any use of grossly excessive force, infliction of lethal wounds after the victim is felled, brutal or vicious circumstances of the killing, and the manner in which or means by which the killing was done.

The trial court did not err in so instructing, as the evidence supported each of the examples given. Evidence of lack of provocation included the victim's weakened condition and defendant's physical integrity on examination. Defendant's conduct in leaving the scene of the assault and callously selling the victim's personal belongings constitutes evidence from which premeditation can be inferred. As discussed above, the nature and extent of the victim's injuries speak to the remaining factors listed in the jury charge. We overrule this assignment of error.

[14] Defendant assigns error to the trial court's denial of his motion to dismiss the charge of common-law robbery. Defendant's argument under this assignment of error, if successful, would apply with equal force to the State's reliance on common-law robbery as the predicate felony for defendant's felony-murder conviction. Because we find defendant's argument unpersuasive, we overrule both assignments of error.

To withstand a motion to dismiss a common-law robbery charge, the State must offer substantial evidence that the defendant feloniously took money or goods of any value from the person of another, or in the presence of that person, against that person's will, by violence or putting the person in fear. *See State v. Norris*, 264 N.C. 470, 472, 141 S.E.2d 869, 871 (1965). Defendant maintains that the evidence suggests that any items taken from the victim's apartment were taken as an afterthought following the murder; thus, the element of violence or "putting in fear" is unsupported by the evidence. Defendant compares this case to *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980), in which this Court reversed a conviction of robbery with a dangerous weapon. We stated: "The gist of the offense is not the taking but the taking by force or putting in fear. . . . We believe that even construing the evidence in a light most favorable to the State, it indicates only that defendant took the objects as an afterthought once the victim had died." *Powell*, 299 N.C. at 102, 261 S.E.2d at 119.

We noted in *Powell* that the evidence showed the "house had not been ransacked, but was neat and clean." *Id.* at 97, 261 S.E.2d at 116. Here, by contrast, the testimony established that the victim's apartment was "a mess" and "in total disarray." The victim usually kept her apartment neat and clean rather than in the state seen by the investigating officers. This evidence distinguishes the present case from *Powell* and negates defendant's suggestion that

he merely picked up a few objects as afterthoughts. Instead, the evidence permits a reasonable inference that defendant engaged in a purposeful search of the victim's apartment, at least some part of which occurred in her presence against her will and by putting her in fear, culminating in removal of the radio and ring.

There was sufficient evidence to support each element of common-law robbery. Items of some value, to wit a ring and a radio, were taken from the victim's apartment near the time of her murder. The force used to threaten the victim, or place her in fear, was such that ultimately she died from it. A homicide victim is still a "person" within the meaning of the statutory definition of armed robbery so long as "the death and the taking are so connected as to form a continuous chain of events . . . ." *State v. Fields*, 315 N.C. 191, 202, 337 S.E.2d 518, 525 (1985). The same rule must hold for common-law robbery.

[15] In a related argument, defendant asks us to find plain error in the trial court's failure to instruct the jury on misdemeanor larceny, a lesser-included offense of robbery. Defendant neither objected to this omission at trial nor assigned error to it while preparing the record on appeal. We discern no plain error in the trial court's choice of instructions because the evidence was insufficient to support the offense of misdemeanor larceny. Defendant's plea of not guilty to the robbery charge will not suffice to negate the State's evidence supporting the element of force or violence in the perpetration of the robbery. The condition of the apartment, coupled with the evidence of violent force displayed by the victim's body, suggest that a robbery, not a larceny, was committed. Absent affirmative evidence that defendant took the victim's belongings only as an afterthought, and that the violence committed against her served no intimidating purpose, defendant was not entitled to an instruction on misdemeanor larceny. *See State v. Zuniga*, 320 N.C. 233, 261, 357 S.E.2d 898, 916 (plea of not guilty, standing alone, insufficient to negate evidence of premeditation and deliberation; defendant not entitled to second-degree murder instruction), *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987).

SENTENCING PHASE

[16] Following a capital sentencing hearing, the jury found the following aggravating circumstances: defendant was engaged in the commission of common-law robbery, N.C.G.S. § 15A-2000(e)(5); the murder was committed for pecuniary gain, N.C.G.S.

§ 15A-2000(e)(6); and the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). We previously have held that submission of both (e)(5) and (e)(6) in aggravation is redundant, and therefore comprises error, when the evidence shows the supporting robbery in fact was committed for the purpose of pecuniary gain, as compared with one committed for another motive. *State v. Quesinberry*, 319 N.C. 228, 239, 354 S.E.2d 446, 453 (1987).[3] Because all the evidence in this case suggests that defendant committed the robbery for pecuniary gain, *i.e.*, to resell the ring and radio for cash, we hold that submission of both (e)(5) and (e)(6) in aggravation was duplicative and constituted error.

The question remains whether submission of the duplicative (e)(6) factor constituted prejudicial error.

When there is "a *reasonable possibility* that the erroneous submission of an aggravating circumstance tipped the scales in favor of the jury finding that the aggravating circumstances were 'sufficiently substantial' to justify imposition of the death penalty," the test for prejudicial error has been met.

*Id.* at 240, 354 S.E.2d at 453 (quoting *State v. Irwin*, 304 N.C. 93, 107, 282 S.E.2d 439, 449 (1981) (emphasis in original)). The jury here found twenty-five mitigating circumstances, among them the following four statutory mitigating circumstances: defendant had no significant history of prior criminal activity, the murder was committed while defendant was under the influence of mental or emotional disturbance, defendant's capacity to appreciate the criminality of his conduct or to conform to the requirements of the law was impaired, and defendant's age at the time of the murder. Jury deliberations regarding sentencing lasted two full days, indicating that the jury did not reach a unanimous recommendation of a sentence of death easily. We thus cannot conclude that there is no reasonable possibility that the erroneous submission of a duplicative aggravating circumstance affected the jury's sentencing recommendation. Accordingly, we set aside the sentence of death and remand for a new capital sentencing hearing. We thus need not address defendant's remaining sentencing phase assignments of error relating to the murder charge.

---

3. We note that this case was tried before we decided *Quesinberry*, and the opinion in that case thus was not available to the trial court here.

**STATE v. DAVIS**

[325 N.C. 607 (1989)]

**[17]**   As a final assignment of error, defendant asserts that prejudicial error occurred during the sentencing for the common-law robbery conviction. In imposing the maximum ten-year sentence for common-law robbery, the trial court found as discrete aggravating factors that the victim was very old and that she was physically infirm. Defendant argues that the victim's physical infirmity was the sole evidence supporting both aggravating factors, in violation of N.C.G.S. § 15A-1340.4(a), which prohibits use of the same evidence to prove more than one factor in aggravation. We disagree. The vulnerability accompanying advanced age is not caused by physical disability alone, but encompasses the slowing of reflexes and lessening acuity of senses which render older citizens relatively defenseless against predators looking for unprotected targets. We have said:

> A victim's age does not make a defendant more blameworthy unless the victim's age causes the victim to be more vulnerable than he or she otherwise would be to the crime committed against him or her, as where age impedes a victim from fleeing, fending off attack, recovering from its effects, or otherwise avoiding being victimized. . . . "[V]ulnerability is clearly the concern addressed by this factor [of the victim's age]."

*State v. Hines,* 314 N.C. 522, 525-26, 335 S.E.2d 6, 8 (1985) (quoting *State v. Ahearn,* 307 N.C. 584, 603, 300 S.E.2d 689, 701 (1983) (emphasis in original) ). The evidence established that the seventy-year-old victim lived alone in an apartment building for the elderly. Defendant knew the victim well, and thus was in a position to assess her vulnerability. This evidence, discrete from that of the victim's physical infirmity, supports the aggravation of the robbery by virtue of the victim's age.

First Degree Murder: Guilt Phase, no error;

Sentencing Phase, new hearing.

Common-law Robbery: no error.

Justice MARTIN dissenting in part.

I remain convinced that the dissent in *State v. Quesinberry,* 319 N.C. 228, 241, 354 S.E. 2d 446, 454 (1987) with respect to the

MADISON CABLEVISION v. CITY OF MORGANTON

[325 N.C. 634 (1989)]

sentencing issue is a correct statement of the law and therefore dissent from that part of the majority opinion awarding defendant a new sentencing hearing. I concur in the remainder of the opinion.

Justices MEYER and MITCHELL join in this dissenting opinion.