**STATE of Minnesota, Respondent,**

v.

**Edward Lee DAVIS, a/k/a Eddie Davis, petitioner, Appellant.**

**No. C7–92–1037.**

Supreme Court of Minnesota.

Aug. 27, 1993.

John M. Stuart, State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., Darrell C. Hill, Asst. Ramsey County Atty., St. Paul, for respondent.

## OPINION

SIMONETT, Justice.

The issue in this case is whether the holding of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), should be extended to peremptory strikes on the basis of religion. In an unpublished opinion, the court of appeals concluded that because the peremptory strike was based on race-neutral grounds there was no equal

protection violation, and, after reviewing the other claims of error, affirmed the defendant's conviction. We granted further review on the peremptory challenge issue and now affirm.

Defendant Edward Lee Davis, an African–American, was charged with aggravated robbery. No jurors were struck for cause during the jury selection. The defense, however, exercised four of its five peremptory strikes, while the State used one of its three. When the State used the one peremptory to strike a black man from the jury panel, defense counsel objected and asked for a race-neutral explanation. *See* footnote 4, *infra.*

The prosecutor, in response, stated for the record that the prospective juror would have been a very good juror for the State and that race had nothing to do with her decision to strike. She explained:

> However it was highly significant to the State * * * that the man was a Jahovah [sic] Witness. I have a great deal of familiarity with the sect of Jahovah's Witness. I would never, if I had a preemptory [sic] challenge left, strike [—] or fail to strike a Jahovah Witness from my jury.

She went on:

> In my experience * * * that faith is very integral to their daily life in many ways, many Christians are not. That was re-enforced at least three times a week he goes to church for separate meetings. The Jahovah Witness faith is of a mind the higher powers will take care of all things necessary. In my experience Jahovah Witness are reluctant to exercise authority over their fellow human beings in this Court House.

The prosecutor concluded her statement by saying she did not feel it appropriate "to further pry" into this matter with the juror because there was no need to when exercising a peremptory on race-neutral grounds. Defense counsel had nothing further to add, and the trial judge ruled the peremptory strike would stand.

There is no transcript of the voir dire, nor do we know the composition of the jury that was selected. In any event, the defendant concedes the State's peremptory was exercised for race-neutral reasons, but now contends that the race-neutral explanation offered by the State is constitutionally impermissible as religious discrimination.

The United States Supreme Court has not ruled on whether *Batson* should extend beyond race-based peremptory challenges. *Batson,* itself, speaks solely of the need to eradicate racial discrimination. "The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions * * *." *Id.* at 97–98, 106 S.Ct. at 1723. The Supreme Court has yet to examine directly the viability of peremptory challenges employed for discriminatory reasons other than race, although just recently it has granted certiorari to examine peremptory challenges based on gender bias. *See J.E.B. v. State ex rel. T.B.,* 606 So.2d 156 (Ala.Civ.App.1992), *certiorari denied* (Ala. 1992), *certiorari granted by* —— U.S. ——, 113 S.Ct. 2330, 124 L.Ed.2d 242 (1993). In the cases the United States Supreme Court has reviewed to date involving *Batson,* it has extended that case's protection against purposeful racial discrimination to defendants whose race differs from that of the excluded jurors, *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), to parties in civil lawsuits, *Edmonson v. Leesville Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), and to prosecutors in criminal cases, *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), but never to other forms of discrimination.

Because *Batson* was crafted as a limited exception to *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the *Batson* equal protection rationale must be read in the context of that earlier case. In *Swain,* the Court recounted the "very old credentials" of the peremptory strike. *Id.* at 212–15, 85 S.Ct. at 831–33. Absent a showing of systematic exclusion of blacks on a petit jury, the Court held that the exercise of the peremptory against black

jurors was not a denial of equal protection of the laws. "In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause." *Id.* at 221, 85 S.Ct. at 836. "In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial," the Court went on to say, "we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case." *Id.* at 222, 85 S.Ct. at 836.

*Swain* was decided in 1965. In *Batson*, decided in 1986, the Court concluded it could no longer ignore the racist manipulation of the jury selection process and, therefore, modified use of the peremptory with respect to race. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1723. Therefore, if the peremptory raises a prima facie case of racial bias, the strike may be challenged, and the proponent must then advance a race-neutral explanation for the strike which, however, need not rise to the level of cause. *Id.* It is against this background that the defendant-appellant asks us to extend the *Batson* exception to *Swain* to include religion.

Defendant-appellant's claim of religious discrimination is one of cross-bias, much like *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), where a white defendant raised a *Batson* challenge to the prosecutor's exercise of a peremptory on a black juror. Here the defendant, presumably not a Jehovah's Witness, is objecting to a peremptory challenge of a juror who is a Jehovah's Witness. Significantly, in *Powers*, while the Court sustained the *Batson* challenge, it did not do so on the theory that the defendant's equal protection rights were violated; rather, the decision was based on an equal protection violation of the excused juror's rights. *Powers*, 499 U.S. at ——, 111 S.Ct. at 1370.[1] The Court further held that the defendant had standing to assert the juror's rights.

The reasoning in *Powers* is pertinent here. *Powers* did not hold that striking the black juror was constitutionally impermissible because that juror might be sympathetic to the white defendant. Rather, the vice of the cross-bias exclusion was twofold: First, racial discrimination "invites cynicism respecting the jury's neutrality and its obligation to adhere to the law." *Id.* at ——, 111 S.Ct. at 1371. Secondly, and equally important, the juror rejected solely because of skin color "suffers a profound personal humiliation * * *." *Id.* at ——, 111 S.Ct. at 1372. And as the Court noted a year later in *McCollum*, —— U.S. at ——, 112 S.Ct. at 2354, "The need for public confidence is especially high in cases involving race-related crime * * * [and] is essential for preserving community peace in trials involving race-related crimes."

If the life of the law were logic rather than experience, *Batson* might well be extended to include religious bias and, for that matter, an endless number of other biases.[2] The question, however, is whether

---

**1.** *Edmonson v. Leesville Concrete Co.*, —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), extending *Batson* to racial bias in civil cases, also relies on the rights of the jurors. Barbara D. Underwood, in her article, *Ending Race Discrimination in Jury Selection: Whose Right is it, Anyway?*, 92 Colum.L.Rev. 725 (1992), argues that the prohibition against race-selected juries should be based on the equal protection rights of the jurors, not the defendant. If a race-selected jury is assumed to be racially biased against the defendant, then, logically, a defendant should be tried only before a jury of his own race, a proposition the United States Supreme Court has rejected. *Id.* at 730. If the claim is that jurors tend to favor defendants of their own race and disfavor defendants of other races, then, "as an empirical proposition, this is a highly controversial claim." *Id.* at 731. Even

if this proposition were true, it is undeserving of equal protection. *Id.* In any event, as Underwood points out, the Court has itself stated that the *Batson* rule does not have a "fundamental impact on the integrity of factfinding," quoting *Allen v. Hardy*, 478 U.S. 255, 259, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986).

"The effort to trace a link between jury discrimination and verdicts, and thereby to identify a harm to litigants, is fundamentally misguided." Underwood, *supra*, at 774. Instead, Underwood argues the harm of jury discrimination is an institutional harm, similar to the harm of discrimination in voting rights.

**2.** "The claim that the [peremptory] rule is in hopeless conflict with the [*Batson*] challenge is frequently linked to the suggestion that the ban

the peremptory strike has been purposefully employed to perpetrate religious bigotry to the extent that the institutional integrity of the jury has been impaired, and thus requiring further modification of the traditional peremptory challenge.

We begin our analysis with a closer look at the role of the peremptory. While jurors have their individual preconceived notions and prejudices, it is assumed that they can set them aside so as to be fair and impartial. The purpose of voir dire is to test that assumption. If it is made to appear that a prospective juror cannot be fair, the juror may be challenged for cause. The peremptory is needed, however, if the challenge for cause is denied by the court. It is needed also when there is legitimate concern for a juror's fairness but this concern is insufficient to be a challenge for cause. It happens often enough that a juror expresses doubt about being able to be fair, but then opposing counsel or the judge ostensibly "rehabilitates" the juror; in this problematic situation, the peremptory is useful. Also, without the peremptory, trial counsel may be deterred from asking probing questions on voir dire for concern that any hostility inadvertently raised could not be remedied by a peremptory strike.

In other words, the peremptory gives added assurance of an accurate verdict by "resolv[ing] doubts (up to a specified number) in favor of exclusion." B. Underwood, *Ending Race Discrimination in Jury Selection: Whose Right Is It, Anyway?*, 92 Colum.L.Rev. 725, 771 (1992). The fact that some unbiased jurors may be excused in the process is an affordable price to pay for removing doubts about a particular ju-

ror's impartiality and competence, especially when the vote of one biased juror can make a critical difference.

Then, too, "the role of the litigants in determining the jury's composition provides one reason for wide acceptance of the jury system and of its verdicts." *Edmonson,* ——— U.S. at ———, 111 S.Ct. at 2088 (quoted in *McCollum,* ——— U.S. at ———, 112 S.Ct. at 2358). The randomness built into the jury pool to obtain a cross-section can seem, to the apprehensive litigant, to be arbitrary and unfair, leaving the litigant to the "luck of the draw." The peremptory alleviates this apprehensiveness by allowing the parties to exercise their own intuitive judgment with respect to perceived juror bias.

It is against this background then that we consider extending the *Batson* challenge to religion. As we have noted, *Batson* is directed at the use of peremptories for purposeful race discrimination. "The reality of practice, amply reflected in many state- and federal-court opinions, shows that the challenge may be, and unfortunately at times has been, used to discriminate against black jurors." *Id.* at 99, 106 S.Ct. at 1724. And Justice Marshall, concurring, pointed out, "Misuse of the peremptory challenge to exclude black jurors has become both common and flagrant." *Id.* at 103, 106 S.Ct. at 1726. *See also Swain,* 380 U.S. at 231–39, 85 S.Ct. at 841–46 (Justice Goldberg's dissent detailing deplorable racial problems with jury selection). Because of these serious and well-documented conditions, the United States Supreme Court has ruled that a party exer-

---

on jury discrimination must inevitably expand to prohibit not only jury selection based on race, but also jury selection based on religion, national origin, gender, language, disability, age, occupation, political party, and a host of other categories. The relationship between the two points is clear: the longer the list of prohibited categories, the less room there is for a lawful challenge other than a challenge for cause." Underwood, *supra*, at 761.

Recently, in *State v. Everett,* 472 N.W.2d 864, 869 (Minn.1991), this court declined to extend *Batson* to age discrimination, noting the United States Supreme Court "thus far" has limited *Batson* to race discrimination.

Justice Marshall, in his *Batson* concurrence, argued for eliminating peremptories entirely in criminal cases. *Id.* at 107, 106 S.Ct. at 1728. Defendant-appellant in this case attaches to his brief, as an appendix, an article by Judge Raymond J. Broderick, *Why the Peremptory Challenge Should Be Abolished,* 65 Temple L.Rev. 369 (1992). The author believes the peremptory is a "flaw in our judicial fabric," which should be totally abolished. *Id.* at 422. For a different view, see S.M. Puiczis, *Edmonson v. Leesville Concrete Co.: Will the Peremptory Survive Its Battle With the Equal Protection Clause?,* 25 John Marshall L.Rev. 37 (1991).

cising a peremptory which is prima facie race-oriented should be called to account.

The use of the peremptory strike to discriminate purposefully on the basis of religion does not, however, appear to be common and flagrant. We are not aware the peremptory is being so misused, nor does the defendant make any such claim. No such problem is documented in appellate court decisions.[3] This is not to say that religious intolerance does not exist in our society, but only to say that there is no indication that irrational religious bias so pervades the peremptory challenge as to undermine the integrity of the jury system.

Then, too, the nature of the bias sought to be eliminated by a *Batson* challenge is particularly illusive in the case of religion. Presumably, the bias sought to be eliminated in jury deliberations is intolerance for the doctrinal beliefs and practices of the adherents of a particular religious group. Yet when religious beliefs translate into judgments on the merits of the cause to be judged, it is difficult to distinguish, in challenging a juror, between an impermissible bias on the basis of religious affiliation and a permissible religion-neutral explanation. In the case before us, for example, would the explanation that the juror was "reluctant to exercise authority over their fellow human beings" be sufficient to overcome a prima facie case of religious bias? A juror's religious beliefs are inviolate, but when they are the basis for a person's moral values and produce societal views on such matters as the use of intoxicating liquor, cohabitation, necessity of medical treatment, civil disobedience, and the like, it would not seem that a peremptory strike based on these societal views should be attributed to a pernicious religious bias.

Furthermore, religious affiliation (or lack thereof) is not as self-evident as race or gender. Consequently, for every peremptory strike, opposing counsel could demand a religion-neutral explanation. This would unduly complicate voir dire and be excessively intrusive for the end sought to be achieved. *Cf. Holland v. Illinois,* 493 U.S. 474, at 484, 110 S.Ct. 803, at 809 (1990) (rejecting Sixth Amendment "fair cross-section" requirement for petit jurors because this would amount, as a practical matter, to the elimination of peremptory challenges).

Because religious bigotry in the use of the peremptory challenge is not as prevalent, or flagrant, or historically ingrained in the jury selection process as is race, we conclude that neither the federal nor our state constitution requires an extension of *Batson.* To extend *Batson* would complicate and erode the peremptory challenge procedure unnecessarily, and it would not serve to remedy any long-standing injustice perpetrated by the court system against specific individuals and classes, as *Batson* clearly does. We decline, therefore, to extend *Batson* to religious affiliation.

Justice O'Connor speaks of *Batson* aptly as "a special rule of relevance." *Brown v. North Carolina,* 479 U.S. 940, 942, 107 S.Ct. 423, 424, 93 L.Ed.2d 373 (1986) (O'Connor, J., concurring in denial of certiorari). It is the "painful social reality" of racial discrimination which acts in a special, institutional sense to implicate the Equal Protection Clause. This implication is lacking for religious affiliation. Consequently, "[o]utside the uniquely sensitive area of

3. In *People v. Wheeler,* 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748, 761–62 (1978); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, 516 (1979), *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); and *State v. Gilmore,* 103 N.J. 508, 511 A.2d 1150, 1159 (1986), state supreme courts barred the use of peremptories based on group bias for race, sex, religion, or national origin. All of these cases, however, dealt specifically with racial bias and no evidence of group bias with respect to religious affiliation in jury selection was presented or suggested. Instead, the cases, all decided before *Batson,* were decided on the "fair cross-section" theory applied to petit juries, a theory since rejected by the United States Supreme Court in *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

There is authority that the religious beliefs of a juror may provide a race-neutral reason for a *Batson* challenge. *E.g., United States v. Clemmons,* 892 F.2d 1153, 1157 (3rd Cir.1989), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990); *People v. Malone,* 211 Ill.App.3d 628, 156 Ill.Dec. 108, 112–13, 570 N.E.2d 584, 588–89 (Ill.App.Ct.1991), *appeal denied,* 142 Ill.2d 660, 164 Ill.Dec. 923, 584 N.E.2d 135 (1991).

race the ordinary rule that a prosecutor may strike without giving any reason applies." *Id.*, at 942, 107 S.Ct. at 424.

This case serves too, we think, to put in perspective the role of "relevance" in both its common law and its constitutional sense. Here the prosecutor announced a presumed group bias. She said she would strike not just this juror but any Jehovah's Witness. But defendant's challenge was only to racial bias. The prosecutor was not advised the State was being charged with religious bias, if, indeed, that charge was being made, which is not at all clear.[4]

If the prosecutor had said no more than she was striking the black juror because he was a Jehovah's Witness, we think this would not have rebutted the prima facie case of racial bias, anymore than if the prosecutor had said she was striking because the black juror was a Lutheran, a Baptist, or a Muslim. In fact, however, the prosecutor went on to explain the reason for her challenge, pointing out Jehovah's Witnesses, as a group, were reluctant to exercise civil authority over other people and that the juror was a devoted member of that religious group.[5]

Ordinarily at common law, inquiry on voir dire into a juror's religious affiliation and beliefs is irrelevant and prejudicial, and to ask such questions is improper. Questions about religious beliefs are relevant only if pertinent to religious issues involved in the case, or if a religious organization is a party, or if the information is a necessary predicate for a voir dire challenge. *Coleman v. United States*, 379 A.2d 951, 954 (D.C.1977). *See, e.g., United States v. Schullo*, 390 F.Supp. 1067 (D.Minn.1975) (Devitt, J.) (in an illegal gambling case, jurors asked by court if they had any moral or religious feelings about gambling so that they could not be fair and impartial). The trial court, in the exercise of its discretion, controls the questions that can be asked to keep the voir dire within relevant bounds. In this case, we do not know how the juror's religious affiliation came to light, but proper questioning for a challenge should be limited to asking jurors if they knew of any reason why they could not sit, if they would have any difficulty in following the law as given by the court, or if they would have any difficulty in sitting in judgment.

Affirmed.

WAHL, GARDEBRING and PAGE, JJ., dissent.

WAHL, Justice (dissenting).

I respectfully dissent.

We deal here not with whether direct voir dire inquiry into religious affiliation of individual jurors ought generally to be allowed. I agree with the majority that such inquiry generally, although not necessarily always, is improper.

Rather, we deal with whether the Constitution allows purposeful discrimination in

---

4. During voir dire, at conference in chambers, defense counsel stated for the record:

> "[I]t's my understanding when there is a juror struck even for a preemptory [sic] challenge that's the same race as the defendant, the defense can request that the State at least put on the record its reason for challenging of that individual juror and I'm requesting that at this time."

At this point the prosecutor gave her explanation about Jehovah's Witnesses as quoted in the beginning of this opinion. When she finished, the court said to defense counsel, "Any comments?" Defense counsel answered, "No, Your Honor." Transcript of Proceedings, Jan. 3, 1992, pp. 107–08. The record does not tell us when it occurred to the defendant to raise a religious bias claim, but apparently it was after the trial.

5. "The Witnesses claim to base all their teachings on the Bible, which they accept as literally true. * * * In the U.S. the society has taken 45 cases to the Supreme Court and has won significant victories for freedom of religion and speech."

"The Witnesses also stand apart from civil society, refusing to vote, run for public office, serve in any armed forces, salute the flag, stand for the national anthem, or recite the pledge of allegiance." *The New Encyclopaedea Britannica*, Vol. 10, p. 131, 132. *See also In re Jenison Contempt Proceedings*, 265 Minn. 96, 120 N.W.2d 515, *judgment vacated*, 375 U.S. 14, 84 S.Ct. 63, 11 L.Ed.2d 39 (1963), *on remand* 267 Minn. 136, 125 N.W.2d 588 (1963) (juror refusing to serve on petit jury because of the Biblical injunction, "Judge not, so you will not be judged.").

jury selection on the basis of religious affiliation. The majority, alluding to Justice Holmes' famous aphorism, says that if the life of the law were logic rather than experience, then it might follow from *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and subsequent cases, that the Constitution does not allow purposeful discrimination in jury selection on the basis of religious affiliation. In my view, the dilemma between logic and experience posed by the majority is a false one in this case. In any event, the very words used by the United States Supreme Court in several of its relevant decisions support my conclusion that the Constitution does not allow purposeful discrimination in jury selection on the basis of religious affiliation.

Near the end of its opinion in *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Court said:

> But there is a distinction between exercising a peremptory challenge to discriminate invidiously against jurors on account of race and exercising a peremptory challenge to remove an individual juror who harbors racial prejudice. This Court firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror. As this Court stated just last Term in *Powers,* "[w]e may not accept as a defense to racial discrimination the very stereotype the law condemns." 499 U.S., at ——, 111 S.Ct., at 1370. "In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, *or the choice of religion.*" *Ristaino v. Ross,* 424 U.S. 589, 596, n. 8, 96 S.Ct. 1017, 1021, n. 8, 47 L.Ed.2d 258 (1976). We therefore reaffirm today that the exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party.

*Id.* —— U.S. at ——, 112 S.Ct. at 2359 (emphasis added).

In *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), the Court held that the Constitution does *not* require that voir dire inquiry into racial prejudice by individual jurors generally be allowed. The *Ristaino* Court also said:

> At least where crimes of violence are involved, [defendant] would require defense motions for voir dire on racial prejudice to be granted in any case where the defendant was of a different race from the victim. He would require a similar result whenever any defendant sought voir dire on racial prejudice because of the race of his own or adverse witnesses. *We note that such a per se rule could not, in principle, be limited to cases involving possible racial prejudice. It would apply with equal force whenever voir dire questioning about ethnic origins was sought, and its logic could encompass questions concerning other factors, such as religious affiliation or national origin.* In our heterogenous society policy as well as constitutional considerations militate against the divisive assumption—as a per se rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion. * * *

*Id.* at 596 n. 8, 96 S.Ct. at 1021 n. 8 (citations omitted) (emphasis added). This suggests to me that the Court might hold that the Constitution does not require that voir dire inquiry into religious affiliation of individual jurors generally be allowed but that the Constitution also does not allow purposeful discrimination in jury selection on the basis of religious affiliation, since religious classifications, like racial ones, are subject to strict scrutiny.

As I said at the outset, I agree with the majority that inquiry on voir dire into religious affiliation of individual jurors generally is improper. Ordinarily there is no basis for such inquiry. The preclusion of such inquiry in no way precludes counsel from asking other questions designed to uncover flaws in individual jurors that would render them unsuitable for jury service in a particular case.

In this case, however, the prosecutor in fact learned of the juror's religious affiliation and, for whatever reasons, expressly stated that the reason for striking the juror was the juror's religious affiliation, without any voir dire of the man as to whether that religious affiliation would interfere with his ability to be a fair juror and responsibly exercise his duties as a juror. When the record of discrimination on the basis of religious affiliation is so stark, this court ought to act. I would extend the holding of *Batson v. Kentucky* to peremptory strikes based on religious affiliation and grant the defendant a new trial.

GARDEBRING, Justice, dissenting.

I join in the dissent of Justice WAHL.

PAGE, Justice (dissenting).

I am in agreement with the dissent of Justice Wahl. I write separately because I believe that Minn.Stat. § 593.32 (1992) provides adequate grounds for resolution of this case, allowing us to avoid reaching the constitutional issues presented.

Under Minn.Stat. § 593.32, subd. 1, a citizen may not be excluded from jury service in Minnesota "on account of race, color, religion, sex, national origin, economic status, or a physical or sensory disability." Thus, if Minn.Stat. § 593.32 applies to the impaneling of juries, the prosecutor's conduct here is a clear violation. It is argued that the provisions of Minn.Stat. § 593.32, subd. 1, apply only to the selection of the jury pool and not to the impaneling of any given jury. However, subdivision 2 of Minn.Stat. § 593.32 suggests otherwise. Subdivision 2 states: "Nothing in subdivision 1 restricts the right to strike an individual *from being impaneled* on a jury for cause based on a showing that a physical or sensory disability will impair the juror's ability to try a particular case." (Emphasis added.) By implication, I read the language of subdivision 2 to say that subdivision 1 applies to the impaneling of juries as well as to creating jury pools. In addition, it would seem to make no sense for the legislature to provide for a system allowing an attorney to peremptorily challenge a juror because of that juror's religion while, at the same time, requiring the attorney to have cause in order to challenge a person with a physical or sensory disability. Therefore, I would hold that the prosecutor's challenge of the prospective juror in this case on the basis of that juror's religion violated Minn.Stat. § 593.32, and I would remand this case to the district court for a new trial.