Ronald L. PRYOR, Sharon R. Pryor, and Gaylon Ward, Appellants–Defendants,

v.

Berdie HOSKINS, Appellee–Plaintiff.

No. 18A02–0109–CV–608.

Court of Appeals of Indiana.

Sept. 11, 2002.

Lynne D. Lidke, Michael B. Langford, A. Jack Finklea, Scopelitis, Garvin, Light & Hanson, P.C., Indianapolis, IN, Attorneys for Appellants.

Karl L. Mulvaney, Patrick A. Elward, Nana Quay–Smith, Candace L. Sage, Bingham McHale, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Ronald L. Pryor, Sharon R. Pryor, and Gaylon Ward (collectively, "the truckers") appeal the jury verdict for Berdie Hoskins in her personal injury action against them.

We reverse and remand for a new trial.

### ISSUES

1. Whether the trial court erred in denying the truckers' peremptory challenge of a juror.
2. Whether the trial court erred in instructing the jury about comparative fault and giving the jury only two verdict forms (rather than three).
3. Whether the trial court erred in its instruction to the jury about the statutory requirement for equipment on a trailer having a gross weight greater than 3,000 pounds.
4. Whether the trial court erroneously denied the truckers' motion for judgment on the evidence made at the close of trial.

### FACTS

In the early morning hours of February 25, 1998, Berdie Hoskins—a 46–year–old African–American woman—traveled from her home in Indianapolis to meet her sister in Muncie. When she reached Muncie, the night had become particularly foggy. Hoskins collided with the back of a tractor-trailer that was parked along a residential street, which is also known as State Road 32. Hoskins brought this action against the driver, Ward, who she alleged had negligently parked the tractor-trailer, and his employers and owners of the trailer, the Pryors for allowing Ward to park so as to create a hazardous condition. Hoskins also alleged that Ward and the Pryors had been negligent in not maintaining the appropriate visible reflectors on the trailer.

At trial, Hoskins testified that when she began to enter Muncie, the fog was very bad; she slowed her speed to about 27 m.p.h. and tried to follow the center line of the road; she did not see the trailer and had no memory of striking it. There was no evidence of skid marks or that Hoskins tried to stop or avoid the trailer before striking it. The collision occurred around 3:00 a.m.

Janet Easterly and David Stover lived two doors south of Ward's house, in front of which he had parked his tractor-trailer. They heard the collision and testified about what they saw that night. Easterly testified that the streetlight next to the trailer created a shadow at the back of the trailer, the back of the trailer was "very dirty," and the taillights were "so dirty" they could not be seen. (Tr. 158). Easterly also testified that she drove toward the truck later that morning, while it was still dark, and she observed that her "own headlights did not reflect on the back of the truck" and the taillights were "not . . . readily visible." (Tr. 163, 165). Stover had gone into the street to check on Hos-

kins after the collision. Stover testified that he had observed how the back of the trailer "was dirty," and how the lights on the back of the truck were "dirty also." (Tr. 201). Stover further testified that the streetlight beside the trailer failed to illuminate the back of the trailer. When shown a picture of the left side of the back of the trailer, wherein there was no reflector, Stover testified that he had seen no evidence of a broken reflector on the street that night. When asked on direct examination what he could see from a distance behind the trailer, Stover testified that the back of the trailer "was dirty," and that because of where the trailer was parked, if he was from out of town and "coming down that highway, [he] wouldn't have seen the truck. Not in time." (Tr. 209).

Ward's testimony about whether there was fog when he parked the trailer about 1:00 a.m. on February 25th was equivocal; essentially, he said that he did not believe there was much fog that night because if so, he would have remembered it. Ward admitted that there was dirt on the trailer's rear reflectors and taillights. Further, Ward acknowledged that the natural flow of traffic on the street led drivers into the lane where he parked because of the slight curve, and that drivers had to make an effort to veer leftward to avoid any parked vehicle. Finally, Ward conceded that parking was prohibited along that side of the street until two houses south of his, but he opined that because it "was legal to park" in front of his house, "no extra precautions were necessary." (Tr. 666).

Hoskins' expert witness, Willard Alroth, a consulting traffic engineer, testified that he did not believe the left rear reflector was on the trailer at the time of the collision because the adjacent taillight lenses—encased in the same "indentation in the back frame structure"—were undamaged. (Tr. 348). Alroth also noted that because the trailer was parked beside a street light, "the entire back of the truck" was "in a shadow because none of the light that would be emanating from that street lamp would be falling on the back of the truck." (Tr. 352). Further, Alroth believed that the amount of dirt on the light fixtures at the rear of the trailer made it "possible that they could not have been seen." (Tr. 346).

At the conclusion of all evidence, the truckers moved for judgment on the evidence. The trial court denied the motion. Subsequently, the trial court gave the jury two verdict forms—one to indicate a verdict for Hoskins and one to indicate a verdict for the truckers. The jury returned a verdict for Hoskins, finding she was 35% at fault, the truckers were 65% at fault, and her damages totaled $435,869.46.

## 1. *Peremptory Challenge*

When the first six potential jurors were questioned during *voir dire*, Hoskins' counsel asked whether "[a]nyone ever had any bad experience with a truck driver." (Tr. 32). Deborah Ivy responded, "We had one (1) who almost run [sic] us off the road when we were going to take our daughter to college in North Carolina in the Virginia area, and another one (1) (inaudible) on the way to Indianapolis that almost ran the car literally off the road. (inaudible) we had to go around." (Tr. 33). Hoskins' counsel then asked Ivy whether she had "any general good feeling, bad feeling, about truck drivers," to which Ivy responded, "They're not my favorite." Four questions later, Hoskins' counsel asked whether any of the six had a "problem with sitting as a juror for [Hoskins]?" Tr. 34. Ivy answered, "She looks familiar to me. I'm not sure—does she have children? I think her children attend my church," and she elaborated that she might have seen Hoskins at her church "maybe

three (3) or four (4) years ago." *Id.* Hoskins' counsel then asked Ivy whether Ivy had talked to Hoskins' daughters, and Ivy answered, "Not recently. Just passed them and said hi." (Tr. 35). When Ivy was asked for more information about the daughters, she said, "They're in their thirties ... I believe" and that she did not "know them that well because they didn't stay very long and they sang in the choir." *Id.* Finally, Hoskins' counsel asked Ivy whether "even though you mentioned earlier that truck drivers aren't your favorite people, do you still think you could sit and hear this case with an open mind today?" (Tr. 35). Ivy answered, "Sure." *Id.*

Subsequently, the truckers' counsel asked whether Ivy was "pretty sure" that she knew two of Hoskins' daughters, to which Ivy responded, "Yes." (Tr. 56). Ivy also affirmed that she recognized the name Hoskins. When asked further about Hoskins' daughters, Ivy said, "They were real quiet. They sang." (Tr. 56). The truckers' counsel asked whether Ivy sang "in the choir as well," but the transcript shows that the answer was inaudible. (Tr. 57). Then Ivy agreed that she would call herself a "social acquaintance[ ]" of Hoskins' daughters. (Tr. 57). Finally, the truckers' counsel asked Ivy whether her familiarity and social acquaintance with Hoskins' two daughters would affect her "ability to fairly listen to the evidence and rule with regard to [the truckers.]" (Tr. 72). Ivy answered, "No."

In a conference with the trial court, out of the presence of the jury, the truckers' counsel sought to exercise two peremptory strikes, for Diane Bumpus and Deborah Ivy. Hoskins' counsel objected to the striking of "both of the black members of this panel." (Tr. 75). The truckers' counsel asserted the strikes "had nothing to do

with race whatsoever," *id.*, and proceeded to explain why he sought to strike Ms. Bumpus.[1] Thereafter, the truckers' counsel explained his reasoning for wanting to strike Ivy:

> With regard to Ms. Ivy, you will recall that she stated in response to [Hoskins' counsel]'s questions that she had had situations where truck drivers had ran [sic] her off the road. We believe that that might be an experience that she's had with truck drivers that could be used against our clients. She also said truck drivers are not my favorite, and I think that's nearly a quote from what she said. Again, with our, the Defendant being in the trucking industry, we think that could be held against her. Of course, and perhaps the most obviously, she is acquainted, in fact, sang in the same church choir with Ms. Hoskins' daughters. We believe that that sort of social relationship could be used against us. Finally, Ms. Ivy, by way of her juror questionnaire, states that she is very involved in a lot of church activities, as is Ms. Hoskins, and we're concerned that she might quickly identify with Ms. Hoskins, develop a relationship with her by virtue of this trial, and therefore use that potentially to sway her view in favor of Ms. Hoskins and against the Defendants. For these reasons, we again take the position that the striking was not due upon race, but for other very legitimate reasons, and we're exercising the wide discretion that we have with preemptory [sic] strikes.

(Tr. 77).

Hoskins' counsel then argued to the trial court that Ivy had indicated she could be fair and opined that the strike of Ivy would be "race-based." (Tr. 78). The trial court

---

1. The trial court found the explanation to be a "plausible and clear articulate non-discriminatory" one, and upheld the strike of Ms. Bumpus. Neither party is challenging the striking of Ms. Bumpus in this appeal.

stated that it was "not satisfied with the explanations given" for striking Ivy, and that the Ivy peremptory challenge would "not be upheld. She'll remain." (Tr. 79).

The truckers maintain that the trial court erred in sustaining Hoskins' objection to their attempt to use a peremptory challenge and strike Ivy after the truckers had provided an adequate race-neutral reason for the strike. In her response, and at oral argument,[2] Hoskins concedes that the truckers' reasons about (1) Ivy's negative experiences with and attitude toward truckers, and (2) Ivy's acquaintance with Hoskins' daughters at her church were race-neutral reasons; but Hoskins asserts that the third reason—about Ivy's involvement in church activities such that she "might quickly identify with Ms. Hoskins, develop a relationship with her by virtue of this trial," (Tr. 77),—"is **not** race-neutral." Hoskins' Br. at 23 (bold in original). Therefore, Hoskins continues, the trial court did not commit error by denying the truckers' attempt to exercise its peremptory challenge to strike Ivy.

■■■ Several considerations apply here in resolving this issue. First, we note the nature of the peremptory challenge itself. The use of a peremptory challenge was created by statute and has existed in Indiana for more than a century and a half. See, e.g., Wiley v. State, 4 Blackf. 458, 1838 WL 1875 (Ind.1838) (citing R.C., 1831, p. 408, "forty-second section of the practice act" for the statutory right of "each party" in a civil case to make "peremptory challenge to three jurors"); and see current Ind.Code § 34–36–3–3 ("Each party in a civil case has three (3) peremptory challenges."). Primarily, "[t]he function of the peremptory system is to eliminate extremes of partiality and to assure the parties that jurors will decide the is-

sues on the basis of the evidence before them." Phillips v. State, 496 N.E.2d 87, 89 (Ind.1986); see also Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Initially, and as a general rule, a peremptory challenge may be "exercised without a reason stated, without inquiry and without being subject to the court's control." Swain, 380 U.S. at 220, 85 S.Ct. 824; see also Bond v. State, 273 Ind. 233, 403 N.E.2d 812, 816 (1980) ("peremptory challenge may be for no cause whatsoever"), and Evansville Metal Bed Co. v. Loge, 42 Ind.App. 461, 85 N.E. 979, 980 (1908).

■■■ A second consideration is applicable constitutional principles. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and "its progeny" limit the exercise of peremptory challenges in order to protect the constitutional right to equal protection under the law of both litigants and prospective jurors, "i.e., the right that a prospective juror will not be excluded from service on the basis of race or gender." Williams v. State, 669 N.E.2d 1372, 1377 (Ind.1996), cert. denied 520 U.S. 1232, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997). Such jurisprudence provides that when one litigant exercises a peremptory challenge to which the other party raises a Batson objection, the objecting party must then establish a prima facie case of the challenge having been racially discriminatory. See Ashabraner v. Bowers, 753 N.E.2d 662, 664 (Ind.2001). If this case is made, the party who made the peremptory challenge then must " 'come forward with a neutral explanation for [the challenge].' " Id. at 665 (quoting Batson, 476 U.S. at 97, 106 S.Ct. 1712). " '[I]f the explanation, on its face, is based on something other than race, the explanation will be deemed race

---

**2.** We want to thank counsel for their preparation in presenting an excellent oral argument,

which we heard on July 16, 2002.

neutral.'" *Id.* (quoting *McCants v. State,* 686 N.E.2d 1281, 1284 (Ind.1997)). Or, as the United States Supreme Court put it, a race-neutral explanation "means an explanation based on something other than the race of the juror." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

Finally, we also must consider the trial court's broad discretion in managing the proceedings before it. *See Williams,* 669 N.E.2d at 1378. Keeping in mind the foregoing considerations, we now review the trial court's denial of the truckers' peremptory challenge of juror Ivy.

■■■ When the truckers sought to exercise their peremptory challenge as to both Bumpus and Ivy, Hoskins objected and argued that they were attempting to strike the only two black members of the jury panel in violation of *Batson.* Therefore, Hoskins established a *prima facie* case. *See Ashabraner,* 753 N.E.2d at 667. Consequently, the truckers were then required to provide a race-neutral reason for the challenge of Ivy. *Id.* at 665. The reason Hoskins argues on appeal as sustaining the trial court's determination to deny the peremptory challenge is that Ivy's church activities would lead her to identify with Hoskins. We find the truckers' explanation about the church-related activities of Ivy and Hoskins is "based on something other than race." *See Ashabraner,* 753 N.E.2d at 664. Likewise, we can find nothing in this reason that suggests a racially discriminatory basis for the challenge.

We are mindful that our supreme court has declared "the trial court's decision on the ultimate question of discriminatory intent" to be "a finding of fact which is accorded great deference." *Williams,* 669 N.E.2d at 1379 (citation omitted). However, as already noted, the reason given by the truckers for seeking to exercise a peremptory challenge to strike Ivy appears to be race-neutral on its face. Further, the record before us provides no argument by Hoskins to the trial court as to why the truckers' reason about Ivy's church involvement should be disbelieved and found to be pretext, masking a discriminatory intent for removing her from the jury. Nor did the trial court state any basis for why it was "not satisfied" that the truckers' reason for seeking to exercise a peremptory challenge as to Ivy was *not* race-neutral.

Having found the argued reason to be race-neutral, we now consider the weight of the truckers' stated reasons as a whole. The truckers had asserted two additional reasons to strike Ivy—Ivy's negative experiences with and attitude toward truckers, and her acquaintance with Hoskins' daughters at her church. These two reasons are so patently race-neutral that Hoskins does not even argue to the contrary on appeal. Moreover, that Ivy knew Hoskins' daughters, attended the same church as they attended, and had a social connection with the Hoskins family is a reason that nearly reaches the level of constituting a challenge "for cause." When we combine the two admittedly race-neutral reasons with the third church-involvement reason discussed above, we conclude that the truckers had indeed shown that their reasons for attempting to exercise a peremptory challenge to strike Ivy were not race-based.

We recognize the tension inherent in balancing the trial court's authority to manage the trials before it, the long history of the right to peremptory strikes granted by succeeding Indiana legislatures, and the principles of *Batson* and its progeny. Nevertheless, based upon the record before us, we conclude that in this case the trial court erred when it denied the truckers' peremptory strike of juror Ivy.

Because we find the trial court's failure to grant the truckers' peremptory strike of Ivy to be error, we must reverse. *See Currin v. State*, 669 N.E.2d 976, 979 (Ind. 1996). Accordingly, we remand for a new trial. Inasmuch as the other issues raised by the truckers may arise on retrial, we proceed to consider them.

### 2. *Instruction and Verdict Forms*

The truckers claim that the trial court erred by giving the jury Instruction # 5 and only two verdict forms. Instruction # 5 provides as follows:

> You must decide this case on the basis of the Indiana law of comparative fault.
>
> The term fault refers to varieties of conduct that make a person responsible, in some degree, for an injury. The type of fault at issue in this case is negligence. I will instruct you further concerning this type of fault.
>
> You shall determine the percentage of fault of the plaintiff and the defendant. These percentages must total one hundred percent (100%).
>
> If you find that the plaintiff's percentage of fault is greater than fifty percent (50%) of the total, then you shall return a verdict for the defendant, and no further deliberation of the jury is required.
>
> If you find the plaintiff's percentage of fault is fifty percent (50%) or less of the total, you then shall determine the total amount of damage the plaintiff would be entitled to recover without regard to fault.
>
> You shall then multiply that total amount of damages by the percentage of fault of the defendant and enter a verdict for the plaintiff in the amount of the product of that multiplication. I have prepared verdict forms that will assist you in arriving at your verdict.

(Appellee's App. 88). The truckers objected to the instruction above beginning with the sentence, "If you find that the plain-tiff's percentage of fault is greater than fifty percent. . . ." Counsel for the truckers explained,

> I believe that there should be a prefaced portion to that sentence, and it should read if you believe Defendants have any negligence, you shall determine the percentage of fault of the Plaintiff and the Defendant, these percentages must total one hundred percent (100%), and then a sentence along the lines of, right after that, if on the other hand you find Defendants have no fault, you should return a verdict for Defendants. And that goes back to this concept under Indiana law, tort law, there's two (2) ways that a jury can find in favor of the Defendants. First of all, there's—one (1), there's no negligence at all, and number two (2) way to find in favor of Defendants is if there is negligence, the negligence of Defendants was something less than fifty percent (50%). And I think that this particular jury instruction leads a jury to believe that there is only one (1) way to find in favor of the Defendants, rather than—and which is that there's a percentage of fault less than fifty percent (50%). So, I would add that extra language to instruction number five (5) that I just mentioned.

(Tr. 703–04).

The trial court provided two verdict forms to the jury. One verdict form was entitled "Verdict for Plaintiff," and contained blanks to specify the plaintiff's percentage, from "0–50%," of fault, and the defendants' percentage, from "0–100%," of fault. (App. 30). The other verdict form was entitled "Verdict for Defendants," and provided blanks for the jury to find the plaintiff's fault as a percentage of "more than 50%" and the defendants' fault as a percentage of "less than 50%." (App. 32).

The truckers argued to the trial court that rather than two verdict forms, there should be three: one verdict form could

find "that the Defendants had no negligence;" another verdict form could find "that the Defendants had negligence but their negligence was less than fifty percent (50%) at fault, and therefore the verdict should be returned for the Defendants;" and a third verdict form indicating that "Defendants had negligence of fifty percent (50%) or more." (Tr. 710, 711). The truckers' counsel argued, ·

> Your jury Verdict Forms, in my opinion, and respectfully, only contemplate two (2) of the three (3) possibilities. They do not contemplate the first possibility that the jury could just flat out find, as Indiana law allows, that the Defendants committed no negligence whatsoever, and we believe that the two (2) jury Verdict Forms that have been submitted suggest to the jury that they need to assign a certain number thirty-seven point zero nine (37.09) contemplates what I'm referring to, single Defendant, we, the jury find for the defendant. We believe that should be one (1) of the jury instructions. In fact, we tendered that as a Verdict Form as part of our tendered final jury instructions, and that would've been Verdict Form B that we tendered. We think that that's the proper Verdict Form to add in addition to those that you already have.[3]

(Tr. 710–11).

Combining their contentions, the truckers argue that the trial court's instruction presumed that they were at fault and, with only two verdict forms, the jurors were not told "that they could find Defendants free of all fault." Appellants' Br. at 18.

■■■ We have long held that "[a]n instruction given to the jury must be a correct statement of the law, be applicable to the evidence adduced at trial, and be relevant to the issues the jury must decide in reaching its verdict." *Kelley v. Watson,*

677 N.E.2d 1053, 1056 (Ind.Ct.App.1997). An instructional error "is cause for reversal only if the instructions as a whole failed to inform the jury as to the applicable law or otherwise misled the jury." *Id.*

■■■ Indiana's Pattern Jury Instruction, No. 6.03(A), applicable to assessing comparative fault with a single plaintiff and a single defendant, is nearly identical to that given by the trial court up to the point about which the truckers objected. At that point, the recommended Pattern Jury Instruction states that *"if the Defendant is not at fault or* if Plaintiff's fault is greater than 50 percent, then you must return your verdict for the Defendant and against the Plaintiff. . . ."* INDIANA PATTERN JURY INSTRUCTIONS (2d ed.2001). The highlighted phrase herein was omitted from the trial court's jury instruction.

We observed in *Evans v. Schenk Cattle Co., Inc.,* 558 N.E.2d 892, 896 (Ind.Ct.App. 1990), *trans. denied,* that an instruction which advises the jury to first consider whether there was any fault on the part of the defendant "allows the jury an efficient and expedited means to render a favorable verdict for the defendant when it finds no negligence on the defendant's part." In such a case, the jury would otherwise embark on "a meaningless exercise of first allocating 0% fault to the defendant and then finding the defendant not negligent." *Id.*

As Hoskins observes, the instruction given by the trial court is not an incorrect statement of the law. *See Kelley,* 677 N.E.2d at 1056. And, we do not find it to actually "mislead" as to the requirements of the law here. *Id.* However, Indiana Pattern Jury Instruction 6.03(A) does contemplate an initial consideration by the jury as to whether the defendant is "not at fault." For that reason, we believe the better practice would be to employ all of

---

**3.** We were unable to locate any such verdict form tendered by the truckers in the record.

the actual language found in the pattern instruction upon retrial.

■ With respect to the jury verdict forms, the recommendation of the Indiana Judges Association is that "Verdict Form No. 37.01(A) should be used along with Comparative Fault Instruction No. 6.03(A)," as they were "drafted to compl[e]ment one another." Comments to Verdict Form No. 37.03(A), INDIANA PATTERN JURY INSTRUCTIONS (2d ed.2001). The recommended verdict form consists of two parts: "Verdict for Defendant," and "Verdict for Plaintiff." Because the trial court followed this recommendation, we find no error therein.

3. *Instruction 13*

■ The truckers also assert that the trial court erred when it instructed the jury as follows:

> You are instructed that it is the law in this State, pursuant to Indiana Code, Section 9–19–6–7(4)(D) and (F), that every trailer or semi-trailer having a gross weight greater than three thousand (3,000) pounds shall have, at minimum, "on the rear, two (2) clearance lamps, one (1) at each side" and "one (1) stoplight." You are further instructed that the law requires, under Section 9–19–6–10(b) that these lamps "must be capable of being seen and distinguished under normal atmospheric conditions . . . at a distance of five hundred (500) feet from . . . the rear of the vehicle."

> If you find from the evidence in the case the defendants' trailer did not have rear clearance lamps or a stoplight capable of being seen and distinguished from a distance of five hundred (500) feet from the rear of the vehicle under normal atmospheric conditions, without excuse or justification, and that the lack of visibility of such clearance lamps or

stoplight was a proximate cause of the collision and the plaintiff's resulting injuries, such a violation of the statute would constitute fault to be assessed against the defendants.

(Appellee's App. 96). The truckers objected to this instruction because "[t]here was no evidence in this case as to how much this trailer weighed." (Tr. 705). This is also the truckers' argument on appeal.

Hoskins responds that the truckers have never contended that the instruction was an incorrect statement of the law. Indeed, such would be untenable inasmuch as the statutory provision was provided to the jury as a stipulated exhibit. *See* Ex. 14. Hoskins also argues that the many admitted photographs of the trailer would allow the jury to infer that the trailer weighed more than 3,000 pounds. However, photographs alone that make it possible to infer the trailer weighed more than 3,000 pounds do not constitute evidence that the trailer did so weigh. Hoskins also suggests that Alroth indicated that certain lights were required on the trailer because of its weight. However, Alroth seems to have testified that the statute required such lights on a trailer weighing more than 3,000 pounds—not that this one did.

Our supreme court has noted the long history of the principle that "it is error to instruct the jury on matters which are not supported by the evidence in the case." *Miller v. Alvey,* 246 Ind. 560, 207 N.E.2d 633, 637 (1965). And, we have cautioned that when a statute "is the main thrust of an instruction," it "must be correctly applied to the issues *and the evidence.*" *Board of Comm'rs of Miami County v. Klepinger,* 149 Ind.App. 377, 273 N.E.2d 109, 114 (1971) (emphasis added). Although giving this instruction without the necessary evidentiary foundation may not rise to the level of reversible error,[4] evi-

---

**4.** We note that the succeeding instruction, Instruction 14, also refers to the statutory

dence that the trailer weighed more than 3,000 pounds should have been adduced at trial to warrant this instruction having been given.

### 4. Judgment on the Evidence

 When a defendant moves for judgment on the evidence at the conclusion of trial, the motion should be granted only where an issue in the case or an essential element of the claim is not supported by sufficient evidence. *S.E. Johnson Companies, Inc. v. Jack,* 752 N.E.2d 72, 76 (Ind. Ct.App.2001). If there is any probative evidence or reasonable inference to be drawn therefrom to support an essential element of the claim, the judgment on the evidence is not appropriate. *Id.* We review a decision to grant or deny a motion for judgment on the evidence for abuse of discretion. *Id.* Using the same standard as the trial court, we consider the evidence in the light most favorable to the non-moving party. *Id.*

 The truckers contend that their motion for judgment on the evidence made at the close of the trial should have been granted. Specifically, they argue that "nothing Ward did proximately caused the accident" because "all Hoskins' evidence shows is that dense, penetrating fog caused her to crash into the back of Ward's trailer," and that Ward "had no duty to do anything more." Appellants' Br. at 24, 25, 26.

Hoskins responds by directing our attention to various evidence before the trial court as to where Ward parked his trailer, what the weather may have been at the time he parked the trailer, the appearance of the back of the trailer, the possible absence of the required reflector on the rear outside corner of the trailer, and Ward's belief that he could have had no

obligation to consider the safety of passing motorists. In the trucker's reply, they return to the question of the fog and argue that "the only direct evidence presented as to the state of the fog when Ward parked between midnight and 1:00 AM was Ward's testimony that the fog was light." Reply at 17.

We cannot agree with the truckers' characterization of Ward's testimony. The general tenor of Ward's testimony was that he could not remember whether it was foggy that night when he parked. He further said that even if there had been heavy fog, "I just parked it where I generally parked it," and he "wouldn't have any concern" about the fog. (Tr. 665). Ward believed "it was legal to park there, and no extra precautions were necessary." (Tr. 666). According to an expert witness, visibility that night began decreasing at 5:45 p.m., (Tr. 524), and it was "highly likely" that the fog that evening had steadily worsened from 7:45 p.m. until it peaked about 2:00 a.m. (Tr. 561). Thus, the evidence about the nature of the fog 'when Ward parked his trailer—according to his own testimony, possibly as late as 1:00 a.m.—is not undisputed.

 The truckers' contention is that Hoskins failed to present sufficient evidence that Ward's parking the truck where he did that night was the proximate cause of her injuries. "A party's act is the proximate cause of an injury if it is the natural and probable consequence of the act and should have been reasonably foreseen and anticipated in light of the circumstances." *Potts v. Williams,* 746 N.E.2d 1000, 1008 (Ind.Ct.App.2001). Based upon the evidence about the fog up to the time Ward parked his trailer, the condition of his trailer, and the particular characteristics of

requirement for "every trailer or semi-trailer having a gross weight greater than three

thousand (3,000) pounds." (Tr. 769). The truckers did not object to this instruction.

the roadway where he parked it, the reasonable inference can be drawn that Ward should have reasonably foreseen that his trailer could be not visible to a passing motorist and, therefore, could cause a collision resulting in injuries. Because the evidence sufficed to show the essential element of proximate cause, the trial court did not abuse its discretion in denying the truckers' motion for judgment on the evidence.

We reverse and remand for a new trial.

BAKER, J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

I agree that the refusal of the trial court to honor the truckers' peremptory challenge of Ms. Ivy requires reversal and remand for a new trial. However, in doing so, I would proffer a slightly different analysis of the three-pronged basis for the challenge.

The challenge was made upon three grounds:

(1) Ivy's statement that because of two incidents, truck drivers "[are] not my favorite." Tr. at 33.

(2) Ivy recalled knowing Hoskins's children who sang in Ivy's church choir and thought of them as social acquaintances.

(3) Because Ivy and Hoskins were both very active in their churches, Ivy

might identify with Hoskins, causing her to favor the plaintiff.

To be sure, Ivy stated that, in spite of these factors, she could hear the evidence and judge the case "with an open mind." Tr. at 35. Nevertheless, in the context of a peremptory challenge, absent a *Batson* type objection, no reason need be given for the challenge. *Price v. State,* 725 N.E.2d 82 (Ind.2000).[5] The defendants were not required to accept Ivy's claim of objectivity.

In this regard it is important to note that a *Batson* type objection to a peremptory challenge is available in civil litigation as well as in criminal cases or other cases in which the government is involved.[6] *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (the Court majority, with Justices O'Connor, Scalia, and the Chief Justice dissenting, found a racially-based peremptory challenge by a private litigant involved state action sufficient to trigger federal constitutional principles).

In the case before us, Hoskins concedes that Ivy's expressed attitude toward truck drivers and her acquaintance with Hoskins's daughters were racially neutral. The majority here states its belief that the matter of acquaintance with members of Hoskins's family, membership in the same church, and a social connection "nearly reaches the level of constituting a challenge 'for cause.'" Op. at 949. In my

5. Since the *Batson* decision prohibiting race-based peremptory challenges, the United States Supreme Court has added challenges based upon ethnicity, *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and gender-based challenges, *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). In *Hernandez,* the challenge was made to Latino jurors, and the Supreme Court analyzed the discriminatory aspects of the case in terms of a race-based challenge.

6. The *J.E.B. v. Alabama* decision involved a civil paternity suit in which the State exercised nine of its ten peremptories to excuse male jurors. In her separate concurring opinion, Justice O'Connor expressed the view that the holding of gender-based discrimination should be limited to "the *government's* use of gender-based peremptory strikes." 511 U.S. at 147, 114 S.Ct. 1419, (emphasis in original).

view, it may very well do so, but the matter of a bias against truck drivers is even more obvious as a cause for removal of the prospective juror.[7]

With regard to the aspect of the peremptory challenge relating to the active church involvement of both Ivy and Hoskins, it is possible to read into that factor a racial overtone. To do so, however, would be to conclude that African–American churchgoers tend to be more involved than other races or that, if they are involved churchgoers, African–Americans bond with each other more closely than churchgoers of other races. Such a reading, however, would necessarily single out African–American churchgoers as a group separate and distinct from all other churchgoers in the larger community. Such a conclusion is neither rational nor factually supported.

The United States Supreme Court has not yet ruled upon whether peremptory challenges based upon religious affiliation are akin to the prohibitions for race, gender, and ethnicity. State court decisions upon the matter are split. *See generally* Caroline R. Krivacka & Paul D. Krivacka, Annotation, *Use of Peremptory Challenges to Exclude Persons from Criminal Jury Based on Religious Affiliation,* 63 A.L.R. 5th 375, 1998 WL 1032133 (1998).

In *Thorson v. State,* 721 So.2d 590 (Miss. 1998) for example, the Mississippi Supreme Court *en banc,* unanimously held that under state statutory and constitutional law, a peremptory challenge of two jurors based solely upon their membership in the Holiness faith was impermissible.

In *State v. Davis,* 504 N.W.2d 767 (Minn.1993), however, the court held that the *Batson* prohibition does not extend to peremptory challenges based upon religious affiliation. In *Davis* the challenge to an African–American juror was not premised upon race but rather upon membership in the Jehovah's Witness faith. In making the peremptory challenge the prosecutor stated that she always challenged members of the faith because they are reluctant to exercise authority over or sit in judgment of their fellow human beings. The Minnesota Supreme Court affirmed allowance of the peremptory challenge. One of the two dissenters, however, distinguished between exclusion of a prospective juror *merely* due to religious affiliation and exclusion of a prospective juror after questioning which would reflect that the juror's religion would interfere with her ability to act impartially. (The prosecutor had not followed up with questions to the jurors concerning their abilities to sit impartially).

I would not speculate upon what the Indiana Supreme Court might decide concerning a peremptory challenge whether based solely upon religion or based upon an arguably neutral ground albeit generated by religious affiliation and/or with possible racial overtones.[8]

Be that as it may, in my estimation, Juror Ivy as a churchgoer was not a member of a sufficiently cognizable group as to trigger the equal protection provisions of the U.S. Constitution. As noted in 50A C.J.S., *Juries,* § 445 at 482:

---

**7.** One may speculate why defendants did not first attempt to challenge Ivy for cause, but a plausible explanation would be that they felt that such a challenge might not be successful and, in light of racially neutral reasons, concluded that a peremptory challenge would be accepted by the court.

**8.** It may be noted, however, that our Supreme Court in *Price, supra,* considered two peremptory challenges based upon age. The prosecutor merely stated as his reason for the challenge that he "preferred not to have young people on the jury." 725 N.E.2d at 86. The Court held that age is not an impermissible basis for using a peremptory challenge.

"There is some authority for the view that, in order for a group to be cognizable, it is necessary that the group be definable and limited by some clearly identifiable factor; a common thread of attitudes, ideas, or experiences run through the group; and that a community of interests exists among the group's members . . . ." (footnote citations omitted).

The Hoskins objection to the peremptory challenge of Ivy with respect to the church affiliation aspect was not sufficient to necessitate the defendants' obligation to come forward with a racially neutral reason for the challenge on that basis. The reason stated for the challenge was, on its face, racially neutral and has not been shown to be a mere pretext for a racially based challenge. The other two bases for the challenge were clearly racially neutral. For the reasons stated herein, in addition to the rationale supplied by the majority opinion, I concur in the reversal and the remand for a new trial.

With regard to Part 3 of the majority opinion, the giving of Instruction 13 was held erroneous solely because there was no evidence that the trailer in question weighed more than 3,000 pounds. Under the evidence of this case, I find two other fatal defects in the tendered instruction.

The instruction refers to the requirement that the vehicle must have two "clearance lamps" on the rear, one on each side, and also a "stoplight." Appellee's App. at 96. The statute, I.C. § 9–19–6–7(4)(E) (Burns Code Ed. Repl.1997), contains a separate requirement for two "reflectors" on the rear of the trailer or semi-trailer. It is clear, therefore, that clearance lamps and stoplights are not the same thing as reflectors. Accordingly, it stands to reason that the "lamps" or "lights" are precisely that and display a light rather than merely reflect a light back into the eyes of the viewer. Such lights may be either red, amber, or yellow. I.C. § 9–19–6–8 (Burns Code Ed. Repl.1997). However, it would seem obvious that such lights require a power source and would not be visible if the trailer were unattended. This conclusion is buttressed by the fact that the requirement states that the clearance lamps be visible "at the times lights are required." I.C. § 9–19–6–10 (Burns Code Ed. Repl.1997).

In this regard, I am unable to perceive that an instruction concerning the use of clearance lamps and a stoplight would have any relevance to a parked and unattended trailer which had been parked and remained parked for a period of several hours.

Furthermore, the instruction states that the visibility requirement for the clearance lamps and stoplight (even assuming them to be in operation at the time in question), is "under *normal atmospheric conditions.*" Appellee's App. at 96 (emphasis supplied). It is unquestioned that the atmospheric conditions at the time with which we are concerned were far from normal. Once again, I fail to perceive any relevance of the tendered instruction to the time, circumstances or conditions present in the case before us.

It is inappropriate to give an instruction which would tend to mislead the jury even though it may contain a correct statement of law in the abstract. *Hotz v. Gelsthorpe,* 180 Ind.App. 24, 387 N.E.2d 78 (1979). As stated in *Indianapolis Hous. Auth. v. Pippin,* 726 N.E.2d 341, 349 (Ind.Ct.App. 2000):

"The purpose of instructions is to guide the jury in the application of correct principles of law *to the facts of the case before them.*" (emphasis supplied).

The instruction in question did not do so. For this reason, and even if there were evidence that the trailer weighed more than 3,000 pounds, the instruction should

have been denied. It should not be given upon retrial.

In all other respects I fully concur.